STATE OF NORTH CAROLINA v. FRANK DOUGLAS EVERHARDT

No. 8925SC29

(Filed 17 October 1989)

1. **Constitutional Law § 51 (NCI3d) — speedy trial — constitutional issue — prosecution delay — no prejudice**

   The trial court did not err by denying defendant's motion to dismiss charges of assault with a deadly weapon inflicting serious injury on constitutional speedy trial grounds where the alleged crime occurred in July 1984; the victim did not report it until the summer of 1987; the police did not interview defendant until August of 1987; a warrant was not procured until November 1987; defendant was indicted in February 1988; and the trial, originally set for June 1988, began on 15 September 1988. Defendant did not point to any evidence that law enforcement officials deliberately or unnecessarily delayed prosecution in order to gain some tactical advantage over defendant and did not demonstrate that the delay actually prejudiced the conduct of his defense.

   **Am Jur 2d, Criminal Law §§ 849 et seq.**

1

# IN THE COURT OF APPEALS

## STATE v. EVERHARDT

[96 N.C. App. 1 (1989)]

2. **Criminal Law § 224 (NCI4th)— Speedy Trial Act—continuances—no violation**

 The trial court did not err in a prosecution for assault with a deadly weapon inflicting serious injury by denying defendant's motion to dismiss under N.C.G.S. § 15A-701 where the trial occurred more than 120 days after indictment only because of continuances; defendant sought one of those delays; the State sought the other two continuances because of crowded dockets and the unavailability of essential State witnesses; and only 80 days ran against the 120-day limit when the periods of time due to continuances were excluded. Parenthetically, N.C.G.S. §§ 15A-701 through 15A-704 were repealed effective 1 October 1989.

 **Am Jur 2d, Criminal Law §§ 849 et seq.**

3. **Assault and Battery § 11.1 (NCI3d)— indictment—deadly weapon—sufficiently alleged**

 The trial court did not err in a prosecution for assault with a deadly weapon inflicting serious injury arising from defendant's sexual assault on his wife by not dismissing the indictment for lack of specificity where, although the indictment alleged that defendant assaulted his wife with a table leg and other objects such as a drink bottle and the evidence tended to show that defendant assaulted her with the leg of a footstool, the difference was more in semantics than in substance; the indictment sufficiently alleged the deadliness of the drink bottle to place defendant on notice of the prosecution; and defendant failed to cite any authority and so abandoned an issue regarding the time period described by the indictment. N.C. Rules of Appellate Procedure, Rule 28(b)(5).

 **Am Jur 2d, Indictments and Informations §§ 261-263, 266.**

4. **Assault and Battery § 14.3 (NCI3d)— sexual assault—deadliness of weapons—evidence sufficient**

 The trial court did not err by failing to dismiss for insufficient evidence the charge of felonious assault with a deadly weapon inflicting serious injury where defendant sexually assaulted his wife with a cola bottle and a six to eight-inch footstool leg. The issue of deadliness was for the jury.

 **Am Jur 2d, Assault and Battery §§ 48-55.**

STATE v. EVERHARDT

[96 N.C. App. 1 (1989)]

5. **Assault and Battery § 14.3 (NCI3d); Rape and Allied Offenses § 5 (NCI3d) — assault with a deadly weapon inflicting serious injury — sexual assault — psychological trauma — physical injury**

The trial court did not err in a prosecution for assault with a deadly weapon inflicting serious injury by allowing the jury to determine that defendant's sexual assaults on his wife with various objects while she was bound hand and foot caused serious physical or bodily injury where the State presented the victim's testimony, testimony by treating physicians and by other experts which tended to prove that the trauma to the victim at the time was both mental and physical; the gravity of the physical injury did not become apparent until well after the incidents; and there was evidence of severe depression, insomnia, anorexia nervosa and severe, chronic headaches. Serious physical injury may be proven even when it is not evident immediately upon the impact of the assault; case law and medical science recognize that physical injury may later manifest itself as a result of psychological trauma.

Am Jur 2d, Assault and Battery §§ 48-55.

6. **Assault and Battery § 14.3 (NCI3d) — sexual assault — proximate cause of injuries**

In a prosecution for assault with a deadly weapon inflicting serious injury arising from defendant's sexual assaults on his wife, the State provided adequate proof that defendant's actions in 1984 proximately caused mental distress which led to mental and physical conditions for which the victim was first treated in January 1985 and hospitalized in September 1985.

Am Jur 2d, Assault and Battery §§ 48-55.

7. **Criminal Law § 34.4 (NCI3d) — sexual assault on wife — prior assaults — admissible to show lack of consent**

The trial court did not err in a prosecution for assault with a deadly weapon inflicting serious injury arising from defendant's sexual assaults on his wife by admitting testimony that defendant had violently abused his wife for years. N.C.G.S. § 8C-1, Rule 404(b) permits admission of extrinsic conduct evidence so long as the evidence is relevant for some purposes other than to prove the defendant had the propensity to commit the act for which he is being tried; in this case, the State sought to prove that, because of the victim's fear arising from

other abuse, her failure to leave the husband's home should not be construed as consent to his abuse. Moreover, the same or like evidence was later admitted without defendant's objection.

**Am Jur 2d, Assault and Battery § 67; Evidence § 366.**

APPEAL by defendant from *Ferrell (Forrest A.), Judge.* Judgment entered 15 September 1988 in Superior Court, CATAWBA County. Heard in the Court of Appeals 30 August 1989.

*Lacy H. Thornburg, Attorney General, by David R. Minges, Assistant Attorney General,* for the State.

*Christian, Houck, Sigmon & Green, by Daniel R. Green, Jr.,* for defendant-appellant.

GREENE, Judge.

This is an appeal by defendant from his conviction of assault with a deadly weapon inflicting serious injury under N.C.G.S. § 14-32(b). The trial court imposed a ten-year sentence.

The State's evidence tended to show that the defendant, Frank Douglas Everhardt, married the wife-victim in July 1974 and they were divorced in October 1985. According to Ms. Everhardt, they separated on 21 July 1984 due to events which occurred the week before.

On 15 July 1984, after preparing supper, bathing their two children and putting them to bed, Ms. Everhardt went to bed. Before she could fall asleep her husband came home drunk, and demanded she get up. When she failed to respond to his demand that she "wake up bitch," he dragged her from the bed by her hair and bashed her head against the floor. While she lay crying he acquired some rope from an adjacent porch and tied her hands and feet separately to the top and bottom of the bed. The defendant then pointed a loaded pistol to her head and said: "If you scream bitch, I will blow your brains out." He then ripped off her clothing and forcibly inserted a six to eight inch footstool leg into her vagina for ten to fifteen minutes. While she still lay bound, he forced her to have vaginal and oral sex. After smoking a cigarette, he untied her. The defendant threatened to kill her if she ever told anyone. That night Ms. Everhardt slept on the couch, and the next day she managed to go to work as usual.

On the next evening the defendant, apparently drunk, again tied Ms. Everhardt to the bed and threatened her with the pistol. The defendant then used a syringe to inject liquor into her vagina for a period of ten to fifteen minutes. He commented when he finished that "I have never seen a drunk pussy before." During this time the defendant repeatedly threatened to kill her and told her that she was stuck with him for the rest of her life since he would make it so that no other man would want her. The next day Ms. Everhardt again managed to go to work.

On the third evening the defendant again tied Ms. Everhardt spread-eagle to the bed and held the gun to her head. He then inserted a cucumber and cola bottles into her vagina. After inserting the cucumber in her vagina, he forced it into her mouth. After forcing her to submit to vaginal sex, the defendant untied her and forcibly pushed her off the bed onto the floor. Ms. Everhardt again slept on the couch and stoically went to work the next day.

On the fourth night, the defendant again tied Ms. Everhardt to the bed, threatening her with the gun. He again inserted the footstool leg into her vagina, with more angry force than on the earlier occasion. He then burned her vagina with a cigarette lighter. During this time he again threatened her and told her he would "fix" her so that no other man would want her. The next day Ms. Everhardt again managed to go to work.

On the fifth evening the defendant attacked Ms. Everhardt in the kitchen where she was preparing supper. Grabbing her by the hair of her head, he threw her to the floor and bashed her head against the floor and dragged her about the house. He then relented long enough for her to put the kids to bed while he watched television. The defendant then tied her, again placing the pistol to her head. He inserted various vegetables into her vagina, including cucumbers, carrots and olives. He then forced her to eat these vegetables. Leaving her tied to the bed, the defendant ate the supper she had prepared for him, all the while laughing and saying how he would fix her so that no one else would want her. After he finished eating, he forced her to have vaginal and oral sex before untying her. Again she sought respite, sleeping alone on the couch.

On the sixth night the defendant again tied Ms. Everhardt, threatened her with the pistol, and forcibly had vaginal and oral sex. Leaving her tied, he then went to the kitchen and got a

plate of spaghetti which Ms. Everhardt had been preparing for supper. As she was compelled to watch, he then masturbated and ejaculated on the spaghetti and forced it into her mouth with a fork, making her eat it. He then inserted a curling iron in her vagina. During all of this, the defendant made statements similar to those of the previous night, and told her she was ugly and was a "pile of shit." After this abuse went on for what "seemed like forever," the defendant left her bound for an hour before returning to untie her. Ms. Everhardt testified that after being untied: "I locked the bathroom door and I threw up and I laid on the bathroom floor and I cried, cried and cried and I knew that I could not stand to live with him anymore and I could not take it anymore."

Ms. Everhardt's sixteen-year-old son testified that in July of 1984 he was eleven or twelve years old. During the week in question, he awakened on two nights and went to the doorway of his parents' bedroom. Each night he saw Ms. Everhardt tied to the bed while the defendant sexually abused her in the manner discussed above. The child heard her pleading for the defendant to leave her alone while the defendant cursed her and threatened to kill her.

The next day Ms. Everhardt and the children moved. She testified she feared the defendant might carry out his threat of killing her, and she also feared for her children's safety. She also feared the defendant because of "years and years of physical violence," although the events of July 1984 were of a different order and degree of abuse compared to earlier occurrences.

Following the incidents of July 1984, Ms. Everhardt felt like she was "the lowest person on the face of the earth," a "nobody." She had no self-esteem and no confidence. She was afraid and ashamed, and she feared that she had done something to cause the abuse the defendant visited upon her.

Ms. Everhardt had been the victim of abuse from childhood through much of her life. An earlier husband had beaten her so badly that in the mid-seventies she required brain surgery to remove damaged nerves, and in 1972 she attempted suicide. Prior to July 1984, she had received psychological counseling from time to time.

After leaving the defendant in July 1984, Ms. Everhardt lived with her mother. In January 1985, Ms. Everhardt entered the First Step Program, a program for victims of spousal abuse directed

by Angela Phillips. This program provided both individual and group counseling. Ms. Phillips testified that upon entering the program Ms. Everhardt was "very weak emotionally and physically," very timid, frightened, ashamed and subdued.

Ms. Everhardt testified that due to the abuse of July 1984, her mental and physical condition had so deteriorated by September 1985 that she was admitted to Catawba Memorial Hospital of Hickory for two weeks. Dr. Phillip Schmitt, her treating psychiatrist, testified as such and as an expert in clinical psychiatry. He described her condition as severely depressed, suicidal, insomnic, anxious and anorexic. He also noted she was subject to chronic, severe headaches. Dr. Schmitt also testified that symptoms such as Ms. Everhardt's could follow traumatic stress, and a substantial delay in the reaction is not uncommon. Dr. Schmitt testified that Ms. Everhardt's mental and physical conditions were related to the sexual and physical abuse by the defendant.

Ms. Everhardt was next hospitalized in December 1986 at Frye Regional Medical Center in Hickory where Dr. Carlos de la Garza, Medical Director of the Eating Disorder Unit, diagnosed her as suffering from anorexia nervosa with severe depression. He described her as "severely malnourished," and he stated that this condition is usually related to past abuse. He testified that often anorexia nervosa victims subconsciously seek to make themselves sexually unattractive by starvation. He testified that "she wanted to be sexually unattractive because in the past she had been abused sexually and she felt that [her sexual attractiveness] was the cause of that [the abuse]."

Beginning in May 1987, Ms. Everhardt was counseled by Roland Mullinax, a clinical social worker at the Family Guidance Center in Hickory. The trial court qualified him as an expert in clinical social work and family therapy. Mr. Mullinax described Ms. Everhardt in May 1987 as suffering from eating and sleeping disorders, low self-esteem and under high stress. Mr. Mullinax stated that his treatment, which continued up to the week before trial, resulted in substantial improvement in her condition.

Frank Everhardt denied all of Ms. Everhardt's accusations. He testified that he had left his wife on 13 July 1984, and by 16 July 1984 he was living in another apartment with a new girlfriend, Diana Williams. The defendant failed to procure Diana Williams' testimony even though he had been in contact with her until a

few months before trial. Also, the defendant denied ever having abused Ms. Everhardt. However, he admitted expressing a desire, to more than one person, to tie her and the police investigator to the back of his pickup truck in order to drag them down a highway. Lastly, the defendant testified that he had been convicted of driving while license revoked, driving while license permanently revoked, larceny of an automobile and driving under the influence.

---

The issues presented are: I) whether the defendant's statutory and constitutional rights to a speedy trial were violated; II) whether the indictment alleged the crime with sufficient specificity; III) whether the State offered sufficient evidence for the jury to find the defendant guilty of assault with a deadly weapon causing serious physical injury; IV) whether evidence of prior assaults by defendant was improperly admitted.

I

[1]    The defendant argues the trial court erred in denying defendant's motion to dismiss all charges on the grounds that defendant was not afforded a speedy trial as required by N.C.G.S. § 15A-701 (1988) and the United States Constitution.

A

The defendant apparently bases his constitutional claim on pre-indictment delays, and he thus asserts abuse of his due process rights. "Essentially a pre-accusation delay violates due process only if the defendant can show that the delay actually prejudiced the conduct of his defense and that it was unreasonable, unjustified, and engaged in by the prosecution deliberately and unnecessarily in order to gain tactical advantage over the defendant." *State v. McCoy*, 303 N.C. 1, 7-8, 277 S.E.2d 515, 522 (1981).

The defendant notes that although the alleged crime occurred in July 1984, the victim did not report it until the summer of 1987, the police did not interview the defendant until August 1987, the police did not procure a warrant until November 1987, and the defendant was finally indicted in February 1988. The trial, originally set for June 1988, began on 15 September 1988.

The defendant fails, however, to satisfy either part of the *McCoy* test. First, the defendant has not pointed to any evidence that law enforcement officials deliberately or unnecessarily delayed

STATE v. EVERHARDT

[96 N.C. App. 1 (1989)]

prosecution in order to gain some tactical advantage over the defendant. Second, even so, the defendant has not demonstrated the "delay actually prejudiced the conduct of his defense . . . ."

The defendant argued unconvincingly that the State's delays prejudicially resulted in the loss of two essential witnesses. One of these witnesses, the defendant's mother, died on 28 June 1987. She died before the State began its investigation, and thus any hesitancy of the State could not have affected her availability. The other potential witness was Diane Williams, the woman with whom defendant claims to have been living in July 1984. Certainly her testimony would have been significant had it tended to prove an alibi, but we have no way of knowing whether the trial delay itself resulted in the absence of this witness. The defendant served this witness a subpoena for the trial initially scheduled 6 June 1988. However, when the re-scheduled trial occurred, she was nowhere to be found. The defendant has not indicated why she became unavailable. In sum, the defendant was afforded due process of law.

B

[2] Defendant's N.C.G.S. § 15A-701 (1988) argument also fails. The trial occurred more than 120 days after indictment only because of continuances. The defendant sought one of these delays. Two other delays occurred as a result of continuances granted at the State's request. The State sought continuances because of crowded dockets and the unavailability of an essential State witness.

"While the burden of proof in supporting a motion to dismiss remains with the defendant, the State has the burden of going forward with evidence to show that periods of time should be excluded from the computation." *State v. Kivett*, 321 N.C. 404, 408, 364 S.E.2d 404, 406 (1988).

We find the State's motions for continuances and the orders granted thereon contained facially valid reasons for continuance, and the orders contained "the mandatory finding that the ends of justice served by granting the continuances outweigh the best interest of the public and the defendant in a speedy trial." *Kivett*, 321 N.C. at 408, 364 S.E.2d at 407. Thus, the periods of time which passed because of the continuances were properly not counted in the computation of the number of days between indictment and trial. Although 206 days passed between indictment (22 February

1988) and trial (15 September 1988), only 80 days ran against the 120-day time limit because of three consecutive continuances beginning 10 May 1988 and ending 13 September 1988. Therefore, no N.C.G.S. § 15A-701 violation occurred.

Parenthetically, we note that effective 1 October 1989, the 1989 General Assembly repealed Article 35 of Chapter 15A (N.C.G.S. §§ 15A-701 through 15A-704). 1989 S.L. Ch. 688, s.1.

II

[3] The defendant also argues the trial court should have dismissed the indictment for lack of specificity. To place a criminal action before the jury, the State must first have alleged the crime with sufficient specificity in the indictment. *State v. Pallet*, 283 N.C. 705, 198 S.E.2d 433 (1973). The jury here convicted the defendant upon an indictment that alleged "on or about the 15-20th day of July, 1984 . . . the defendant . . . unlawfully, willfully and feloniously did assault . . . [Ms.] Everhardt with a table leg, a deadly weapon, by repeatedly inserting it and other foreign objects such as drink bottles into the vagina of . . . [Ms.] Everhardt while she was bound hands and feet with a rope, inflicting serious injury."

The defendant argues the indictment did not specify any deadly weapon which was proven in evidence. "[I]t is sufficient for indictments or warrants seeking to charge a crime in which one of the elements is the use of a deadly weapon (1) to name the weapon and (2) either to state expressly that the weapon used was a 'deadly weapon' or to allege such facts as would *necessarily* demonstrate the deadly character of the weapon." *State v. Palmer*, 293 N.C. 633, 639-40, 239 S.E.2d 406, 411 (1977).

The defendant asserts the indictment was faulty since it alleged he assaulted the victim with a "table leg," and the evidence tended to show the defendant assaulted Ms. Everhardt with the leg of a footstool. This is more a difference in semantics than in substance. The defendant had fair warning that the State sought to prosecute him for assaulting his wife with the leg of a piece of furniture, and the State explicitly called it a deadly weapon and provided the approximate date on which the assault occurred. We have no doubt the defendant was fully aware of the nature of the crime the State sought to prove.

Regarding the "drink bottles" mentioned in the indictment, we also conclude the indictment sufficiently alleged deadliness of

these objects to place the defendant on notice of the prosecution. The indictment states the defendant assaulted Ms. Everhardt with a deadly weapon by inserting the furniture leg *and* other objects such as *drink bottles* into her vagina. While the indictment may not be the model of clarity, it does "charge the offense with sufficient certainty to apprise the defendant of the specific accusation against him so as to enable him to prepare his defense. . . ." *Pallet,* 283 N.C. at 708, 198 S.E.2d at 434.

The defendant also raises an issue regarding the time period described by the indictment during which the criminal acts were alleged to have occurred. Since the defendant failed to cite any authority, this assignment of error is deemed abandoned. North Carolina Rule of Appellate Procedure 28(b)(5).

### III

[4] The defendant also argues the trial court erred in failing to dismiss for insufficient evidence the charge of felonious assault with a deadly weapon inflicting serious injury. "If there is more than a scintilla of competent evidence to support allegations in the warrant or indictment, it is the court's duty to submit the case to the jury." *State v. Horner,* 248 N.C. 342, 344-45, 103 S.E.2d 694, 696 (1958).

### A

We first address whether sufficient evidence of use of a deadly weapon was placed before the jury. A deadly weapon is:

Any instrument which is likely to produce death or great bodily harm, under the circumstances of its use . . . . The deadly character of the weapon depends sometimes more upon the manner of its use, and the condition of the person assaulted, than upon the intrinsic character of the weapon itself.

Where the alleged deadly weapon and the manner of its use are of such character as to admit but one conclusion, the question as to whether or not it is deadly within the foregoing definition is one of law, and the court must take the responsibility of so declaring.

*State v. Smith,* 187 N.C. 469, 470, 121 S.E. 737 (1924) (citations omitted). However, "[i]f there is a conflict in the evidence regarding either the nature of the weapon or the manner of its use, with some of the evidence tending to show that the weapon used or

as used would not likely produce death or great bodily harm and the other evidence tending to show the contrary, the jury must, of course, resolve the conflict." *Palmer*, 293 N.C. at 643, 239 S.E.2d at 413.

Regarding the deadly character of the drink bottles, we find the evidence presented clearly placed the issue before the jury. A cola bottle is "an instrument which, depending on its use, may or may not be likely to produce great bodily harm . . . ." *State v. Joyner*, 295 N.C. 55, 65, 243 S.E.2d 367, 374 (1978) (cola bottle inserted into victim's rectum).

Similarly, we are unable to hold that a six to eight inch stool leg, and "the manner of its use" compel a conclusion that it was not a deadly weapon. The issue of the deadliness of the stool leg was for the jury.

B

[5] The defendant also contends the trial court erred in allowing the jury to determine that the defendant's assault caused serious injury since the State presented no evidence of physical harm.

"The term 'inflicts serious injury,' under G.S. 14-32(b), means physical or bodily injury resulting from an assault with a deadly weapon." *Joyner*, 295 N.C. at 65, 243 S.E.2d at 373 (citing *State v. Jones*, 258 N.C. 89, 128 S.E.2d 1 (1962) ). "Whether serious injury has been inflicted must be determined according to the particular facts of each case and is a question which the jury must decide under proper instructions." *Id*. The State's failure to provide any evidence of physical or bodily injury may preclude the jury from deciding the issue. *Id*.

The State contests this last statement, citing *State v. Boone*, 307 N.C. 198, 297 S.E.2d 585 (1982) for the proposition that serious injury may also be proven by showing serious mental injury. The Court in *Boone* decided that "serious personal injury" as used in N.C.G.S. § 14-27.2 *et seq*. may be established on proof of mental injury in order to raise the severity of rape and sexual offense cases from second to first degree. In so holding, the Supreme Court noted that the state legislature had redefined first degree rape to include the language "serious personal injury," in place of the former language "serious bodily injury." 307 N.C. at 202, 297 S.E.2d at 588. The Supreme Court explicitly limited its holding to the rape statute. 307 N.C. at 204, 297 S.E.2d at 589.

While "a wrecked nervous system" is often considerably more painful and enduring than "wounded or lacerated limbs," *May v. Western Union Telegraph Co.*, 157 N.C. 416, 422, 72 S.E. 1059, 1061 (1911), this court is not at liberty to extend the *Boone* decision to the interpretation of N.C.G.S. § 14-32. The language of N.C.G.S. § 14-27.2, "serious personal injury," and the legislative context in which it arose, differs substantially from the language of N.C.G.S. § 14-32, "serious injury." Further, in *State v. James*, 321 N.C. 676, 365 S.E.2d 579 (1988), the Court continued to adhere to the "physical or bodily" interpretation for N.C.G.S. § 14-32, explicitly accepting earlier case law which the Court had rejected in *Boone* in application to N.C.G.S. § 14-27.2.

We do, however, determine the State presented sufficient evidence of physical or bodily injury. The State presented the victim's testimony, testimony of treating physicians and of other experts which tended to prove the trauma to Ms. Everhardt at the time of the incident was both mental and physical. However, the gravity of the physical injury incurred did not become apparent until well after the incident. The State's case included evidence of severe depression, insomnia, anorexia nervosa, and severe, chronic headaches.

In Dorland, *Medical Dictionary* (26th ed. 1985), depression is defined as "a psychiatric syndrome consisting of dejected mood, psychomotor retardation, insomnia, and weight loss . . . ." Psychomotor retardation means "underactivity of both mind and body . . . ," and more specifically, psychomotor pertains "to *motor effects* of cerebral or psychic activity." (Emphasis added.)

Insomnia is an "inability to sleep; abnormal wakefulness." Anorexia nervosa is "a psychophysiologic condition . . . characterized by severe and prolonged inability or refusal to eat, sometimes accompanied by spontaneous vomiting, extreme emaciation, amenorrhea (impotence in males), and other biological changes." Psychophysiologic pertains "to psychophysiology; having bodily symptoms of a psychogenic origin." Psychogenic means "having an emotional or psychologic origin (in reference to a symptom), as opposed to a physicogenic, or organic basis." Lastly, psychophysiology is "the science that deals with the relationship between psychologic and physiologic processes."

As the definitions indicate, the case at hand requires at least a superficial venture into psychophysiology. Such ventures are not

unknown to North Carolina jurisprudence. An instructive example is *Dickens v. Puryear*, 302 N.C. 437, 276 S.E.2d 325 (1981), a civil action for intentional infliction of emotional distress. The elements of the civil cause of action are reminiscent of the criminal case at hand since here also we have extreme and outrageous conduct, intended to cause and causing severe emotional distress. Significantly, the Court there held that "[r]ecovery may be had for the emotional distress so caused *and* for any other *bodily* harm which proximately results from the distress itself." *Dickens*, 302 N.C. at 452-53, 276 S.E.2d at 335 (emphasis added). Neither immediate physical injury nor foreseeability were required. *Id.* Indeed, we also see a psychophysiologic observation in Restatement (2d) of Torts Sec. 46, Comment k, regarding intentional infliction of emotional distress. "Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe."

N.C.G.S. § 14-32(b) punishes an assailant only where the victim incurs serious physical or bodily injury. Physical injury is certainly something more than emotional distress. *See Dickens*, 302 N.C. at 448, 276 S.E.2d at 332 (dictum). We hold that serious physical injury may be proven even when it is not evident immediately upon the impact of the assault. Case law and medical science recognize that physical injury may later manifest itself as the result of psychological trauma.

The seriousness of the injury was properly before the jury. When an injury may or may not be serious "depending upon its severity and the painful effect it may have on the victim," the issue is for the jury to determine upon "the particular facts of each case." *State v. Ferguson*, 261 N.C. 558, 560, 135 S.E.2d 626, 628 (1964). Here the victim endured considerable physical pain and was hospitalized for her condition. These are two factors to be considered in determining whether an injury is serious. *State v. Owens*, 65 N.C. App. 107, 111, 308 S.E.2d 494, 498 (1983).

The pain of Ms. Everhardt's severe, chronic headaches could be a serious physical injury. Whether a headache results from a blow to the head or a blow to the psyche is legally irrelevant since either headache may feel the same physically to the victim, and here we are concerned only with whether the victim experiences a serious physical injury. Further, insomnia is a physical as well as a mental phenomenon, and a jury could properly find it to be

a serious injury. Anorexia nervosa is by definition both physical and mental, and ample evidence was available to the jury that the victim here suffered physical emaciation therefrom. Lastly, depression involved psychomotor retardation which has to do with the physical manifestations of the depressed mental condition. From this evidence we find the State established the victim incurred physical or bodily injury. We are unable to state, as a matter of law, that these injuries are *per se* not serious. Thus, the issue was properly placed before the jury to determine whether any of these injuries were serious. *Ferguson*, 261 N.C. at 560, 135 S.E.2d at 628.

C

[6] The defendant also argues the State provided inadequate proof that his actions in July 1984 proximately caused mental distress which led to the mental and physical conditions for which Ms. Everhardt was first treated in January 1985 and hospitalized in September 1985. North Carolina homicide cases are instructive on the principles of causation applicable in criminal law:

> To warrant a conviction in this case, the State must establish that the acts of the defendants were a proximate cause of the death. "[T]he act of the accused need not be the immediate cause of death. He is legally accountable if the direct cause is the natural result of the criminal act." *State v. Minton*, 234 N.C. 716, 722, 68 S.E.2d 844, 848 (1952); *State v. Everett*, 194 N.C. 442, 140 S.E. 22 (1927). There may be more than one proximate cause and criminal responsibility arises when the act complained of caused or directly contributed to the death. *State v. Luther*, 285 N.C. 570, 206 S.E.2d 238 (1974); *State v. Horner*, 248 N.C. 342, 103 S.E.2d 694 (1958).

*State v. Cummings*, 301 N.C. 374, 377, 271 S.E.2d 277, 279 (1980). *See generally* Torcia, 1 *Wharton's Criminal Law* § 26 (14th ed. 1978); 22 C.J.S. *Criminal Law* § 45 (1989).

To prove causation the State must prove (1) that defendant's actions caused the mental distress, and (2) the mental distress led to the physical conditions later experienced. *See Kimberly v. Howland*, 143 N.C. 399, 404, 55 S.E. 778, 780 (1906) (civil action for physical injuries manifesting themselves after "nervous shock" caused by defendant's negligence). As the preceding paragraphs indicate, in principle, nothing prevents the State from proving its

case by such a chain of causation. *See generally* 38 Am. Jur. 2d *Fright, Shock, and Mental Disturbance* §§ 13-24 (1968). Proof in fact here first consisted of the victim's own testimony. *Cf. Scott v. State*, 169 Ga. App. 710, 314 S.E.2d 718 (1984) (victim's testimony as to injury and treatment admissible to prove aggravated assault). Ms. Everhardt testified as to the devastating emotional effects of the defendant's abuse. Also, she testified, without objection, that her later mental breakdown with the associated physical illnesses was the result of the incidents of 1984.

The jury, having heard the details of Ms. Everhardt's ordeal and having heard Ms. Everhardt's testimony of its emotional impact, had sufficient evidence from which to determine Ms. Everhardt immediately incurred severe psychological injury from the defendant's abuse. Expert testimony was not necessary since the issue presented is not "so far removed from the usual and ordinary experience of the average man that expert knowledge is essential to the formation of an intelligent opinion. . . ." *Gillikin v. Burbage*, 263 N.C. 317, 325, 139 S.E.2d 753, 760 (1965). In other words, the defendant's actions were so outrageously abusive that the jury was not faced with a complicated medical question in determining those actions caused the victim severe psychological harm.

Proving the next link in the causal chain perhaps would have been more difficult in the absence of expert testimony. However, we need not decide whether the victim's testimony would have sufficed alone. The State also presented expert testimony to the effect that Ms. Everhardt's mental condition and the physical symptoms associated therewith could have been caused by traumatic abuse such as Ms. Everhardt experienced. "Whether the physical injury was the natural and proximate result of the fright or shock is a question to be determined by the jury upon the evidence, showing the conditions, circumstances, occurrences, etc." *Watkins v. Kaolin Mfg. Co.*, 131 N.C. 536, 541, 42 S.E. 983, 985 (1902). Here the jury had the victim's detailed account of these factors as well as the expert testimony of Drs. Schmitt and de la Garza relating her physical conditions to physical and sexual abuse.

The defendant argues the jury would have no basis for determining whether Ms. Everhardt's physical symptoms were the result of the abuse of July 1984 or the abuse and stress she underwent in earlier years. However, the State was not required to prove that Ms. Everhardt's physical condition absolutely could not have

been caused by something other than the events of July 1984. It was only required to prove beyond a reasonable doubt that the defendant's abuse in July 1984 caused her eventual mental breakdown and physical injuries. *See State v. Minton*, 234 N.C. 716, 721, 68 S.E.2d 844, 847 (1952) (homicide case); *see also Cummings*, 301 N.C. at 377, 271 S.E.2d at 279. The jury could reasonably have found that some preexisting mental condition or instability could have been aggravated by the abuse of July 1984, thus causing serious injury.

> The consequences of an assault which is the direct cause of the death of another are not excused nor is the criminal responsibility for the death lessened by a preexisting physical condition which made the victim unable to withstand the shock of the assault and without which preexisting condition the blow would not have been fatal.

*State v. Atkinson*, 290 N.C. 673, 682, 259 S.E.2d 858, 864 (1979), *overruled on other grounds*, 302 N.C. 101, 273 S.E.2d 666 (1981) (citations omitted); *see also* 22 C.J.S. *Criminal Law* § 45 (one whose act results in a criminal offense is guilty of the crime even though a concurrent cause is an "existent infirmity" of the victim).

## IV

[7] The defendant also argues the trial court erred to the defendant's prejudice by admitting evidence of assaults occurring prior to those for which the defendant was tried. Indeed, Ms. Everhardt testified the defendant had violently abused her for years.

North Carolina Rule of Evidence 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

North Carolina Rule of Evidence § 404(b) (1988).

This list of other purposes is nonexclusive, and thus evidence not falling within these categories may be admissible. *State v. Morgan*, 315 N.C. 626, 340 S.E.2d 84 (1986). Rule 404(b) permits admission of extrinsic conduct evidence so long as the evidence is relevant for some purpose other than to prove the defendant

has the propensity to commit the act for which he is being tried. *Id.* The record clearly reflects the State sought admission of prior acts to explain Ms. Everhardt's failure to move out. Specifically, the State sought to prove that because of her fear arising from earlier abuse, Ms. Everhardt's failure to leave her husband's home should not be construed as consent to his abuse. In *State v. Young,* 317 N.C. 396, 413, 346 S.E.2d 626, 636 (1986), the Court held evidence of victim's knowledge of defendant's prior acts "may be admitted to show that the victim's will had been overcome by her fears for her safety where the offense in question requires proof of lack of consent or that the offense was committed against the will of the victim." In most cases the victim's consent would likely be irrelevant to enforcement of N.C.G.S. § 14-32(b). However, in the peculiar case at hand, evidence of the victim's consent to the sexual abuse with potentially deadly weapons could well have negated the State's ability to prove serious injury occurred. Had the victim consented to the abuse, the State would have had great difficulty proving the defendant's acts resulted in psychological trauma which manifested itself in serious physical injury.

Although admissible under Rule 404(b), the probative value of this evidence must still outweigh the danger of undue prejudice to the defendant to be admissible under Rule 403. *State v. Frazier,* 319 N.C. 388, 390, 354 S.E.2d 475, 477 (1987). This issue is a "matter within the sound discretion of the trial court, 'and his ruling may be reversed for an abuse of discretion only upon a showing that it "was so arbitrary that it could not have been the result of a reasoned decision." ' " *State v. Jones,* 89 N.C. App. 584, 594, 367 S.E.2d 139, 145 (1988) (citations omitted). Here the record shows no abuse of discretion by the trial court in admitting this evidence.

Additionally, the same or like evidence was later admitted without defendant's objection. Accordingly, the defendant's objection to the admission of testimony regarding such prior assaults and physical abuse is waived, and no prejudicial error results by reason thereof. *See State v. Tysor,* 307 N.C. 679, 300 S.E.2d 366 (1983).

Lastly, the defendant's two remaining assignments of error relate to evidentiary matters. Since the defendant failed to present any substantive argument or citation on these issues, the assignments of error are deemed abandoned. North Carolina Rule of Appellate Procedure 28(b)(5). Nevertheless, we have examined these issues and found them without merit.

No error.

Judges JOHNSON and EAGLES concur.