STATE OF NORTH CAROLINA v. MICHAEL IVER PETERSON

No. COA05-973

(Filed 19 September 2006)

**1. Search and Seizure— warrants—scene of suspicious death—supporting affidavits sufficient**

There was no error in the issuance of two search warrants for the scene of a suspicious death where the supporting affidavits were sufficient to at least suggest something more than a fall.

**2. Search and Seizure— warrant—computer at scene of suspicious death—conclusory affidavit**

There was no prejudicial error from an insufficiently supported search warrant for the computer in a house where there had been a suspicious death. The warrant's affidavits did not include the substance of conversations or discoveries during the investigation that might lead one to check the computers; however, there was no prejudice in light of other properly admitted evidence.

**3. Evidence— prior similar death—probative of lack of accident**

A similar death seventeen years earlier was properly admitted in the prosecution of defendant for the first-degree murder of his wife. The evidence was probative of the absence of accident and the trial court did not abuse its discretion by finding the evidence relevant; it is not necessary that the State specifically connect defendant to the prior act so long as substantial similarities suggest that the same person committed both acts. The evidence is prejudicial to defendant, but not substantially so, considering that the balance under N.C.G.S. § 8C-1, Rule 403 favors admissibility of probative evidence.

**4. Evidence— bisexuality—relevant to rebut opening statement—not unduly prejudicial**

Defendant's bisexuality was properly admitted in a prosecution of defendant for the first-degree murder of his wife. The evidence was relevant to rebut defendant's opening statement about a happy and loving relationship, and the trial court's finding that the probative value outweighed any prejudice to defendant was not arbitrary or manifestly unsupported by reason.

STATE v. PETERSON

[179 N.C. App. 437 (2006)]

**5. Evidence— potential inheritance—financial difficulties— motive for murder—admissibility**

Evidence of a large potential inheritance combined with financial difficulties may be evidence of a motive for murder. The court here, in the prosecution of defendant for the murder of his wife, properly allowed evidence of their financial situation as well as evidence of her job status.

**6. Evidence— credit report—no prejudice**

Defendant did not demonstrate prejudice from the admission of a credit report, even assuming that it was hearsay.

**7. Criminal Law— prosecutor's closing argument—assurance of good faith prosecution**

The State's closing argument, viewed in context, was an effort to refute defendant's theory of bad faith prosecution and not an improper assurance that the State would not prosecute improperly.

**8. Criminal Law— prosecutor's closing argument—personal assurance of credibility—curative instruction**

The impropriety of a prosecutor's personal assurance of the credibility of the State's experts was eliminated by the court's curative instruction.

**9. Criminal Law— prosecutor's closing argument—burden of showing curative instruction insufficient—not met**

Defendant did not carry his burden of showing that the court's curative instruction failed to prevent prejudice.

Judge WYNN dissenting.

Appeal by defendant from judgment entered 10 October 2003 by Judge Orlando F. Hudson, Jr. in Durham County Superior Court. Heard in the Court of Appeals 18 April 2006.

*Attorney General Roy Cooper, by Assistant Attorney General John G. Barnwell and William B. Crumpler, for the State.*

*Winston and Maher, by Thomas K. Maher, for defendant-appellant.*

*Smith Moore, L.L.P., by James G. Exum, Jr., and Law Offices of Kerstin Walker Sutton, P.L.L.C., by Kerstin Walker Sutton, for the North Carolina Academy of Trial Lawyers, amicus curiae.*

ELMORE, Judge.

Michael Peterson (defendant) appeals from a judgment entered consistent with the jury's verdict finding him guilty of first-degree murder. After a thorough review of the record, relevant law, and arguments of the parties, we hold that defendant received a trial free from prejudicial error; as such, we affirm the judgment against him.

Defendant argues that a warrant used to collect evidence from his house, specifically his computer, was constitutionally deficient and tainted the outcome of his trial. While we wholeheartedly agree the warrant in question is void of sufficient probable cause, and the trial court erred in denying defendant's motion to suppress, our review of the trial court's error supports a determination it was harmless beyond a reasonable doubt. Defendant also argues that evidence of prior misconduct and sexual orientation was errantly introduced to the jurors and affected their ability to render a fair decision. We determine that there is no prejudicial error in the trial court's decision to allow presentation of this evidence. Further, although defendant disputes the relevancy and admissibility of his wife's financial status, we find no error in the trial court's rulings. And finally, in a lengthy and contentious trial where both the State and defendant were ably represented, we see no prejudicial error in the State's remarks during closing statements.

On 9 December 2001, at 2:40 a.m., defendant called the City of Durham's 911 center from his residence. He stated that his wife, Kathleen Peterson (Kathleen), had fallen down the stairs. Defendant further stated that she was unconscious but was still breathing. Defendant hung up and then called back to 911 a short time later, claiming that Kathleen was not breathing. Approximately seven to eight minutes after defendant's initial 911 call, James Rose and Ron Paige—paramedics with the Durham County Emergency Medical Services—arrived at the Peterson residence. Defendant's son, Todd Peterson (Todd), arrived at the same time as the paramedics.

The Peterson house is a large estate home with an open foyer entrance. The paramedics found the front door open and noticed blood on it. Straight ahead through the front door is the large, main staircase leading to the second floor. Immediately to the left after entering, however, is a front hallway leading down to the kitchen. Off of this hallway near the kitchen is an enclosed, narrow stairwell also leading to the second floor. Upon entering the house, the paramedics observed Kathleen lying at the bottom of this stairwell. Her legs were

out into the hallway and her head was just inside the encased, open doorframe where the first few steps are located. The stairwell runs parallel to the hallway, but has a few angled steps at the bottom designed to open up the staircase perpendicular to the hallway. Defendant was seen standing over Kathleen in a "semi-knees-bent position" with blood on his hands, arms, legs, and feet; he wore shorts and a t-shirt partially blood-soaked with splatter spots.

When paramedics arrived at Kathleen's body, Todd tried to pull defendant away, stating, "Dad, she's dead, the paramedics are here." Paramedics Rose and Paige quickly determined that Kathleen had no pulse and was not breathing. Defendant stated that he had gone outside to turn off the lights, came back in, and found her at the bottom of the steps. Paramedic Rose testified that there was an "enormous amount of blood involved." He saw "dried blood on the steps, and also on the wall. And it also looked like it had been wiped away or wiped on. It had been smeared, instead of just blood droplets just soaking down the wall." He testified that based on his experience there was an unusual amount of blood for a fall, and the most severe injury he had seen from a fall was a broken neck. The blood under Kathleen's head had already clotted and started to harden.

Later that day, Dr. Deborah Radisch, a pathologist with the Office of the North Carolina Medical Examiner, performed an autopsy on Kathleen's body and determined the cause of death to be blunt force trauma of the head. The autopsy revealed multiple contusions and abrasions on the head and neck; seven distinct lacerations on the posterior scalp; and contusions and abrasions on the arms, wrists, and hands.

Also on that day, Investigator A.H. Holland, Jr., a member of the Criminal Investigation Division of the Durham Police Department, applied for and received a search warrant to search the Peterson residence at 1810 Cedar Street, Durham, North Carolina. The warrant stated that the property to be seized included, *inter alia*, fingerprints, bloodstains, physical layout and measurements of the premises, documentary evidence indicating ownership, and moving pictures, video, and still pictures to preserve the nature of the crime scene. Investigator Holland's affidavit supporting probable cause included the following underlying facts:

> This applicant has been a law enforcement officer for more than nineteen years. I am currently assigned to the Homicide Unit of the Criminal Investigation Division of the Durham Police Depart-

ment. I have been an Investigator with the Durham Police Department since 1989. During this time I have been assigned to conduct follow-up investigations of Child Sexual Abuse, Adult Rape, Aggravated Assault and Homicide.

On December 9, 2001, 0309 hrs., I, Inv. A.H. Holland, Jr., was paged by On-Call CID Supervisor Sgt. Fran Borden in reference to a Death Investigation at 1810 Cedar St. Sgt. Borden advised that the victim, age 47, fell down a flight of stairs and there was a large amount of blood present at the scene. At 0359 hrs., this investigator arrived at 1810 Cedar St. Prior to entering the front door, I observed blood on the sidewalk that leads to the front door. Upon entering the front door, I observed blood on the inside of the door. Sgt. Terry Wilkins advised that the victim's husband had blood all over his person. I saw the victim at a distance, but did not approach. At this point, this investigator made the decision to obtain this Search Warrant.

On 10 December 2001 Investigator Holland applied for and received a second search warrant. This warrant stated the premises to be searched as defendant's residence along with four vehicles not on the first warrant. The probable cause for the second warrant simply repeated the probable cause from the affidavit for the first warrant.

On 12 December 2001 Investigator Holland applied for and received a third search warrant to search defendant's residence. That warrant stated that the property to be seized included all items from the previous warrant as well as "computers, CPUs, files, software, accessories and any and all other evidence that may be associated with this investigation." The only additional probable cause listed in Investigator Holland's application for the search warrant was the following statement: "After conferring with the District Attorney's Office and the State Medical Examiners Office, this applicant has probable cause to believe that additional evidence remains at the residence."

On 20 December 2001 defendant was indicted on the charge of first-degree murder for the death of Kathleen. Before trial, the court denied defendant's motion to suppress all evidence seized as a result of the 9, 10, and 12 December 2001 search warrants.

At trial, the State's evidence relative to motive tended to show that Kathleen had worked at Nortel Networks. Helen Prislinger, a process analyst and project manager for Nortel Networks, reported

directly to Kathleen. Ms. Prislinger testified that Kathleen telephoned her on 8 December 2001, at 11:08 p.m. Ms. Prislinger informed Kathleen that she had documents to e-mail her for a meeting the coming Sunday in Canada. Kathleen asked someone in the room for an e-mail address and gave it to Ms. Prislinger.

Todd Markley, a lead consultant at CompuSleuth, which performs forensic processing and investigation, testified as an expert in forensic computer examination. He examined a disk drive from defendant's computer and identified an e-mail sent 8 December 2001 at 11:53 p.m. from Ms. Prislinger. He could not determine if the e-mail had been read, but was "pretty confident" that the attached documents were not extracted. Mr. Markley also testified that he recovered a large volume of pictures of sexual activity that were on the computer as a result of web browsing. The State introduced numerous e-mails between defendant and Brent "Brad" Wolgamott, a male escort. In these e-mails with Mr. Wolgamott, defendant attempted to set a time to "hook up" with Mr. Wolgamott and also indicated that defendant understood he would be paying for sexual services. The State further introduced an e-mail dated 23 February 2001 from Dirk Yates, an operator of a web service dealing in homosexual pornography.

The State also introduced numerous papers that were collected by the police from defendant's den or study area. This paperwork included naked photographs of Mr. Wolgamott, escort reviews of Mr. Wolgamott, and printouts of e-mails between defendant and Mr. Wolgamott discussing defendant paying Mr. Wolgamott for sexual services. This paperwork was intermingled with other various paperwork including a tax appraisal of defendant's residence, Kathleen's cell phone bill from Sprint, and Kathleen's flex benefit confirmation statement from Nortel.

Regarding the Petersons' finances and Kathleen's job status at Nortel Networks, Raymond Young, a special agent, certified public accountant, and certified fraud examiner with the North Carolina State Bureau of Investigation, testified that at the time of Kathleen's death, the value of the Petersons' major assets was $1,618,369.00.[1] In 1999, $276,790.00 was received into the Petersons' bank account[2] and

---

1. When assessing the value of various real properties, Agent Young used the 2001 tax assessed value.

2. The amount coming into the bank account included: Kathleen's salary from Nortel, payments for defendant's work, defendant's disability income from the VA and military, defendant's retirement account distribution, VA and civil service payments for Martha and Margaret Ratliff, gross rental income, and miscellaneous income.

$461,400.00 left the account. In 2000, $203,390.00 was received into the account and $300,760.00 left the account. In 2001, $180,480.00 was received into the account and $288,000.00 left the account. On the Petersons' 1999, 2000, and 2001 tax returns, defendant had no taxable income from employment.

Katherine Kayser, an administrative assistant at Nortel Networks, testified that in 2001, Kathleen earned $145,000.00 plus a bonus of $10,750.00. At Nortel, she obtained the following stock options: In 1994, 4,800 shares at $3.94 per share and she had 1,600 shares outstanding; in 1995, 5,600 shares at $4.2113 per share; in 1996, 4,800 shares at $5.6175 per share; in 1997, 5,600 shares at $8.8513 per share; in 1998, 6,000 shares at $11.29 per share; in 1999, 4,000 shares at $17.43 per share; in January 2000, 2,000 shares at $37.94; in April 2000, 2,000 shares at $57.41 per share; and in July 2000, 2,000 shares at $80.69 per share, and all were outstanding. In September 2000, Nortel's stock plunged. All of Kathleen's stock options from 2000 were cancelled as the market price fell below the option price; she was going to trade them in; however, upon her death they were reinstated. Kathleen exercised 3,200 shares of options with a purchase price of $3.94 in five separate transactions of 500, 800, 500, 200, and 1,200 shares with market prices of $36.75, $32.75, $37.625, $31.94, and $19.40 respectively, for a total profit of $80,431.50, less $31,054.05 in taxes for a net profit of $49,377.45. She exercised her last option in March 2001.

Ms. Kayser also testified that as Kathleen's beneficiary, defendant received $29,360.38 after taxes from her 401(k) plan; $94,455.75 after taxes from her retirement benefits; and $223,182.46 from her deferred compensation fund. Kathleen also had a life insurance policy for which she had filled out a "Life Insurance Beneficiary Designation Form" listing defendant as the beneficiary; however, she had neither signed nor dated that form.[3]

Kim Barker, a human resource employee at Nortel, testified that from the fourth quarter of 2000 through 2001 Nortel laid off employees, described by Nortel as "optimization." In November of 2001, Kathleen was placed on the "optimization list" for three days. However, Ms. Barker did not know if Kathleen knew that she was on

---

3. The form was entered into the system on 29 July 1997. But she had previously filled out and signed another beneficiary form, in which Fred Atwater, her prior husband, was the beneficiary. As of the trial, Prudential had not yet determined who would receive the $1,450,000.00 in funds.

the list. Ms. Barker testified that a terminated employee is not entitled to continue a company life insurance policy.

John Huggard, an expert in the field of estate planning, testified as to how Kathleen's estate would be divided, pursuant to the laws of intestate succession, between defendant and Kathleen's daughter, Caitlin Atwater.

E-mails recovered from defendant's computer also related to the Petersons' finances. One e-mail was from defendant to his ex-wife, Patty Peterson, asking her to pay a portion of their sons' living expenses. Another was an e-mail from Thomas Ratliff to defendant on 19 April 2001, responding to defendant's request that Thomas pay $5,000.00 per semester for Martha Ratliff's college expenses.

The trial court also allowed the State to present evidence related to the death of Elizabeth Ratliff, a friend of defendant and his first wife, who died under circumstances with factual similarities to the death of Kathleen. The facts regarding this incident will be set forth more fully in our discussion of the issue arising from the ruling to admit this evidence.

Defendant presented evidence tending to support the theory that Kathleen died as a result of an accidental fall down the stairs. He presented several expert witnesses who testified regarding the blood splatter patterns and the biomechanics of a fall to support his theory of accident.

On 10 October 2003 a jury found defendant guilty of first-degree murder. From that verdict and resulting sentence to life imprisonment without parole, defendant appeals.

## I. Warrant

[1] On 4 March 2002 and 14 February 2003 defendant filed motions to suppress the evidence seized from the Peterson home. On 31 March 2003 the trial court conducted a hearing on these motions. The trial court's order, entered on 28 April 2003, contains nineteen findings of fact and five conclusions of law determining that the police had probable cause for the issuance of each of the three search warrants used to search and process the Peterson house during the time after Kathleen's death. Defendant argues that each warrant was invalid. Specifically, he argues each affidavit supporting the warrants was void of sufficient facts to suggest probable cause that a crime had been committed.

STATE v. PETERSON

[179 N.C. App. 437 (2006)]

"[T]he standard of review in evaluating a trial court's ruling on a motion to suppress is that the trial court's findings of fact 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.' " *State v. Buchanan,* 353 N.C. 332, 336, 543 S.E.2d 823, 826 (2001) (quoting *State v. Brewington,* 352 N.C. 489, 498, 532 S.E.2d 496, 501 (2000) (citations omitted)). "Where an appellant fails to assign error to the trial court's findings of fact, the findings are 'presumed to be correct.' " *State v. Downing,* 169 N.C. App. 790, 794, 613 S.E.2d 35, 38 (2005) (citations omitted). Since defendant did not assign error to the trial court's findings, those findings are deemed conclusively supported by competent evidence. *See id.* Our review, therefore, is limited to determining whether those findings support the trial court's conclusions of law. *See State v. Logner,* 148 N.C. App. 135, 138, 557 S.E.2d 191, 193-94 (2001). If so, the conclusions stand; however, this legal determination is something we review anew. *See State v. McArn,* 159 N.C. App. 209, 211-12, 582 S.E.2d 371, 373-74 (2003); *see also State v. Fernandez,* 346 N.C. 1, 11, 484 S.E.2d 350, 357 (1997) ("[T]he trial court's conclusions of law must be legally correct, reflecting a correct application of applicable legal principles to the facts found.").

It is axiomatic that probable cause serve as the basis for the issuance of search warrants, *see* U.S. Const. amend IV; and section 15A-244 of our General Statutes mandates the particular methodology of establishing it. Applications for warrants must contain statements of fact "supported by one or more affidavits particularly setting forth the facts and circumstances establishing probable cause to believe that the items are in the places or in the possession of the individuals to be searched[.]" N.C. Gen. Stat. § 15A-244(2) and (3) (2005).

> The affidavit is sufficient if it supplies reasonable cause to believe that the proposed search for evidence probably will reveal the presence upon the described premises of the items sought and that those items will aid in the apprehension or conviction of the offender. . . . Probable cause does not mean actual and positive cause nor import absolute certainty. . . . The facts set forth in an affidavit for a search warrant must be such that a reasonably discreet and prudent person would rely upon them before they will be held to provide probable cause justifying the issuance of a search warrant. . . . A determination of probable cause is grounded in practical considerations.

*State v. Arrington,* 311 N.C. 633, 636, 319 S.E.2d 254, 256-57 (1984) (internal citations omitted); *State v. Greene,* 324 N.C. 1, 8-9, 376

S.E.2d 430, 435-36 (1989), *sentence vacated on other grounds*, 329 N.C. 771, 408 S.E.2d 185 (1991). "[W]hether probable cause has been established is based on factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." *State v. Sinapi*, 359 N.C. 394, 399, 610 S.E.2d 362, 365 (2005) (citations and quotations omitted). As such, the affidavit and warrant are reviewed not under a microscope, but under the totality of the circumstances. *See Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548 (1983).

> Thus, under the totality of the circumstances test, a reviewing court must determine "whether the evidence as a whole provides a substantial basis for concluding that probable cause exists." *State v. Beam*, 325 N.C. 217, 221, 381 S.E.2d 327, 329 (1989); *see also Gates*, 462 U.S. at 238-39, 76 L. Ed. 2d at 548 (concluding that "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis'" to conclude that probable cause existed (citation omitted)). In adhering to this standard of review, we are cognizant that "great deference should be paid [to] a magistrate's determination of probable cause and that after-the-fact scrutiny should not take the form of a *de novo review*." *Arrington*, 311 N.C. at 638, 319 S.E.2d at 258.

*State v. Pickard*, 178 N.C. App. 330, 334-35, 631 S.E.2d 203, 207 (2006).

The trial court's findings in the case *sub judice* are essentially a recitation of the events leading up to the issuance of the warrants. Taken as true, they reflect that Investigator Holland obtained an initial search warrant for the Peterson residence and one Jaguar vehicle on 9 December 2001 at 6:04 a.m. The probable cause was based on the relay of information regarding an excessive amount of blood at the base of the stairs, blood "all over" defendant, and blood droplets on the door and sidewalk outside. Also noted in the affidavit was Investigator Holland's background of nineteen years on the force and his connection with homicide investigations.

The property to be seized was identified with some level of particularity.

> Fingerprints, bloodstains, fired and unfired bullets and casings, any and all other weapons, footwear impressions, trace hair and clothing fibers, physical layout of the premises, measurements of the premises, moving pictures, video, and still pictures to preserve the nature of the crime scene; documentary evidence indi-

cating ownership, possession and control of the premises; and any and all evidence that may relate to the Death Investigation.

Thus, this first search warrant was sought and issued within a matter of hours after police discovered Kathleen's body. The probable cause outlines that Kathleen suffered a fall down a set of stairs. There was an excessive amount of blood located around the body for a fall down the stairs. There was also blood at various points inside and outside the house. Notably, the victim's husband's hands and clothes were covered in blood. Under a deferential standard, these statements are sufficient to at least suggest something more than a fall and perhaps even a homicide, albeit that innocent explanations for the blood also might exist. "Probable cause is a flexible, common-sense standard. It does not demand any showing that such a belief be correct or more likely true than false. A practical, nontechnical probability is all that is required." *State v. Zuniga*, 312 N.C. 251, 262, 322 S.E.2d 140, 146 (1984). Accordingly, looking for a weapon, whether that be a blunt object, sharp object, or gun would be sufficient based on this evidence. Further, ascertaining evidence about the scene would also be justified, including pictures, measurements, fingerprints, impressions, or fibers. Even without a warrant, police can search an entire home for other victims or assailants, securing items in plain view, if they believe a homicide could have occurred. *See State v. Williams*, 116 N.C. App. 225, 229-30, 447 S.E.2d 817, 820 (1994) (discussing warrantless search exception for emergency situations). The second search warrant, issued on 10 December 2001, was identical to the first warrant, except that four different motor vehicles were substituted for the motor vehicle listed in the first warrant. Defendant does not separately challenge the probable cause underlying the second warrant; our analysis for these first two warrants is the same. The principles stated *supra* support affirming the use of the first two warrants; however, the third is more precarious.[4]

[2] The third warrant is similar in many respects to the first two. The warrant recites an identical "property to be seized" section, save for one change. The warrant includes the statement: "Evidence to be seized shall include computers, CPUs, files, software, accessories and any and all other evidence that may be associated with this inves-

---

4. Defendant, although arguing the validity of the "second" warrant in his brief, makes no reference to the warrant issued on 10 December 2001; instead, the parties discuss the warrant issued on 12 December 2001. This warrant is technically the third warrant and we will label it accordingly.

tigation." The probable cause stated in the affidavit supporting the seizure of computers in the homicide investigation is identical to that recited before: amount of blood at scene of fall; the location of blood on defendant, the house, and exterior areas; and the background of Investigator Holland. The additional facts that separate this warrant from the others are merely that: "After conferring with the District Attorney's Office and the State Medical Examiners Office, this applicant has probable cause to believe that additional evidence remains at the residence."

> An affidavit signed under oath or affirmation by the affiant and indicating the basis for the finding of probable cause by the issuing magistrate must be a part of or attached to the warrant. . . . The affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant; but the affidavit in such case must contain some of the underlying circumstances from which the affiant's informer concluded that the articles sought were where the informer claimed they were, and some of the underlying circumstances from which the affiant concluded that the informer, whose identity need not be disclosed, was credible and his information reliable. . . . Whether the affidavit is sufficient to show probable cause must be determined by the issuing magistrate rather than the affiant. This is constitutionally required by the Fourth Amendment. . . .
>
> . . .
>
> Probable cause cannot be shown "by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the 'underlying circumstances' upon which that belief is based. . . . Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police." . . . The issuing officer "must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion. . . ."

*State v. Campbell*, 282 N.C. 125, 129-31, 191 S.E.2d 752, 755-56 (1972) (internal citations omitted).

The affidavit here does not include the substance of the conversations or discoveries in the thirty-six hour investigation that might lead one to need to check the computers in the home. *See State v. McHone*, 158 N.C. App. 117, 121-22, 580 S.E.2d 80, 83-84 (2003) (affi-

davit insufficient when it contained no information as to substance of a lengthy interview with defendant, only that a conversation occurred). The affidavit does not include any indication, other than the amount of blood, that would suggest a search of defendant's computer would lead to information regarding the potential homicide. *See State v. Goforth*, 65 N.C. App. 302, 307-08, 309 S.E.2d 488, 493 (1983) (application to search house for drugs and drug activity that is supported solely by conclusory statements suggesting the activities are present is not constitutionally sufficient). The affidavit only includes a wholly conclusory statement that *the affiant* has probable cause to search the computers in defendant's house. *See State v. Hyleman*, 324 N.C. 506, 510, 379 S.E.2d 830, 832-33 (1989) (when the affiant fails to state the substance of information received from other sources and fails to disclose any facts that would lead a magistrate to reasonably believe that evidence of a crime existed at defendant's residence, then "[t]he inadequacies of the affidavit resulted in the magistrate being confronted with an insufficient, 'bare bones' application for a search warrant."). This deficient *factual* statement offered to support an *independent* basis for probable cause cannot stand, regardless of the deference due the trial court. *See, e.g., State v. Edwards*, 286 N.C. 162, 170, 209 S.E.2d 758, 763 (1974) ("We conclude that in instant case the search warrant was invalid because the affiant did not inform the magistrate of *any* underlying circumstances from which the *informant* concluded that non-tax-paid whiskey was where he said that it was."); *Gooden v. Brooks, Comr. of Labor*, 39 N.C. App. 519, 251 S.E.2d 698 (1979) (Fourth Amendment protection consists of including the underlying facts necessary to allow the issuing officer to determine the existence of probable cause, not the affiant.).

This Court in *State v. Sheetz*, 46 N.C. App. 641, 265 S.E.2d 914 (1980), reviewed a similar warrant and arrived at the same conclusion. There, the warrant's supporting affidavit established nothing more than the district attorney's inclination to review a retail store's financial records following a fire.

> [T]hat as a result of an investigation being conducted by the Forsyth County Sheriff's Department into a fire occurring at Clemmons Florist and Gift Shop on August 28, 1978 in Forsyth County, Clemmons, North Carolina, the said District Attorney has reason to believe that the examination of certain records in the possession of Charles Steven Sheetz and one Clemmons Florist Gift [sic] Shop and the entire business and working records of the Clemmons Florist and Gift Shop would be in the best interest of

the enforcement of the law and the administration of justice in Forsyth County . . .

*Id.* at 647, 265 S.E.2d at 918. Relying on *Campbell*, this Court found constitutional error without hesitation.

One of the grounds upon which our Supreme Court [in *Campbell*] held the seizure of the drugs unconstitutional was that nowhere in the affidavit was there a sufficient statement of underlying circumstances *from which the magistrate could have concluded* that probable cause existed. We believe that the affidavit in question contains the same flaw. The allegation that agents have conducted an investigation which has disclosed evidence of irregularities which, if supported by evidence and found to be true, would constitute serious violations of the law on the part of the defendant, without the disclosure of facts from which the magistrate could ascertain the existence of irregularities that would constitute serious violations of the law, does not meet the constitutional standard for issuance of a search warrant.

*Id.* at 648, 265 S.E.2d at 919. Just as in *Sheetz*, the affidavit supporting the warrant in this case woefully fails to pass constitutional muster.

Notably though, every error, even of a constitutional magnitude, does not require reversal. "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a doubt. The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C. Gen. Stat. § 15A-1443(b) (2005); *State v. Silva*, 304 N.C. 122, 133, 282 S.E.2d 449, 456 (1981) ("When the error committed deprives a defendant of a constitutional right, prejudice is presumed, and the burden is on the State to prove otherwise."); *State v. Rhodes*, 151 N.C. App. 208, 217-18, 565 S.E.2d 266, 272 (2002) (applying a harmless beyond a reasonable doubt standard to a violation of defendant's Fourth Amendment right). Since our analysis of whether the violation of defendant's Fourth Amendment rights is harmless beyond a reasonable doubt requires a review of the error in light of all evidence introduced at trial, we will review the remainder of defendant's issues first.

After careful consideration, we determine that the State has met its burden in this case; the evidence and testimony admitted in defendant's trial pursuant to the third warrant did not prejudice

defendant in light of other properly admitted evidence. Evidence from a search of defendant's computer is the crux of what was recovered and admitted pursuant to the invalid warrant. That evidence suggested that the Petersons were possibly in financial difficulty, that defendant had homosexual interests, that an e-mail was sent to Kathleen the night of her death, and perhaps that the Petersons' marriage was strained. This same evidence was presented through numerous other sources: Helen Prislinger testified about sending the e-mail to defendant's account; ample evidence of defendant's possible predilection for homosexuality was introduced by printed e-mails and photos seized from the desk drawer next to the computer pursuant to a valid warrant; and copious amounts of evidence and testimony was admitted regarding the Petersons' faltering financial condition. As such, the evidence introduced pursuant to the invalid warrant was nothing more than repetition of other properly admitted evidence, thereby rendering its impact on the jury harmless beyond a reasonable doubt.

## II.  Rule 404(b) Ratliff Evidence

[3] The trial court conducted an extensive *voir dire* hearing on the proposed Rule 404(b) evidence regarding Elizabeth Ratliff, an individual close to defendant who seventeen years prior to Kathleen's death was found dead at the bottom of a set of stairs.

Elizabeth Ratliff worked as a teacher with the Department of Defense Dependent School System, and her husband George was an officer in the United States Air Force. In the early 1980s the couple lived in Klein Gerau, Germany. Both were good friends with defendant and his first wife, Patty. After George's death in 1983, defendant began to help Elizabeth with funeral arrangements, financial matters, and general support. About a year after her husband's death, Elizabeth and the couple's two daughters moved to a house down the street from the Petersons in Graefenhausen, Germany. Defendant continued to help care for the Ratliff family over the next year.

Then, at around 7:15 a.m. on 25 November 1985, Barbara Malagino, permanent nanny to the Ratliff children, found Elizabeth dead at the bottom of the main staircase in her home. A friend and co-worker of Elizabeth's, Cheryl Appel-Schumacher, testified that she arrived at the house around 9:00 a.m.; she described the scene.

She stated that defendant was there, talking mainly with the police, military, and other official personnel at the house. Along with

defendant and those officials, several other people were in the small foyer area: Amy Beth and Bruce Berner, neighbors of the Ratliff family; Patty Peterson; and a taxicab driver. Elizabeth's body was at the bottom of the stairs; she was wearing a pair of yellow boots and was partially covered by a coat. There was blood sprayed down the wall of the open staircase, blood on the wall opposite the foyer area, blood on a chest and footlocker, and a pool of blood underneath Elizabeth's body. Ms. Appel-Schumacher also described a smaller pattern of blood droplets at the top of the stairs, above a light switch. It appeared to have been flicked from a brush, whereas the blood down the wall was more of a tear drop pattern which increased in size further down the stairs. Ms. Appel-Schumacher said that she, her husband, and someone else, probably defendant, helped clean up the blood after Elizabeth's body was taken away. She also testified that on the Thursday before Elizabeth died, Elizabeth complained to her about headaches and had scheduled an appointment with a doctor for the following week.

Elizabeth's sister, Margaret Blair, testified that defendant called her later in the day on 25 November 1985 and informed her of Elizabeth's death. He said she accidentally fell down the stairs and died. Sometime near the funeral, Margaret spoke with defendant regarding the events surrounding her sister's death. Defendant told her that he and his wife had the Ratliff family over for dinner and he returned with them to help get the girls to bed and take out the trash.

Margaret Blair also testified that Elizabeth had planned a trip to Copenhagen, Denmark, over the upcoming Christmas vacation. She further testified that pursuant to Elizabeth's will defendant and Patty became guardians of Martha and Margaret Ratliff. Defendant received various household goods and benefits associated with the two children.

On 27 November 1985 an autopsy performed by the United States military determined Elizabeth's cause of death to be "[i]ntracranial hemorrhage, cerebellar-brain stem secondary to Von Willebrand coagulation abnormality . . . [s]calp lacerations secondary to terminal fall." The military investigation concluded there were "no indications of foul play."

On 14 April 2003 Elizabeth's body was exhumed and an autopsy performed by Dr. Deborah Radisch revealed contradictory findings. Dr. Radisch determined the cause of death to be blunt force trauma to the head. Dr. Radisch noted multiple injuries, including marks on

the head, seven distinct lacerations, and injuries to the left hand, forearm, and back. Dr. Radisch opined that the "intracranial hemorrages noted at the first autopsy were primarily the result of blunt trauma rather than any underlying natural disease process."

Defendant argues the trial court erred in admitting this evidence pursuant to Rule 404(b). Ultimately, we disagree.

> Article IV of the Rules of Evidence deals with the relevancy of evidence. Rules 401 and 402 establish the broad principle that relevant evidence—evidence that makes the existence of any fact at issue more or less probable—is admissible unless the Rules provide otherwise. Rule 403 allows the trial judge to exclude relevant evidence if, among other things, "its probative value is substantially outweighed by the danger of unfair prejudice." Rules 404 through 412 address specific types of evidence that have generated problems. Generally, these latter Rules do not flatly prohibit the introduction of such evidence but instead limit the purpose for which it may be introduced.

*Huddleston v. United States*, 485 U.S. 681, 687, 99 L. Ed. 2d 771, 781 (1988). Rule 404(b) is "a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Rule 404(b) states that evidence of other crimes, wrongs, or acts may be admissible if probative of "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2005). "This list of proper purposes is neither exclusive nor exhaustive." *State v. Church*, 99 N.C. App. 647, 653, 394 S.E.2d 468, 472 (1990) (citing *State v. Young*, 317 N.C. 396, 412, 346 S.E.2d 626, 635 n.2 (1986)). Thus, so long as evidence of defendant's prior acts makes the existence of any fact at issue, other than the character of the accused, more or less probable, that evidence is admissible under Rule 404(b). *See Coffey*, 326 N.C. at 278-79, 389 S.E.2d at 54.

Despite this broad notion of inclusion, the Rule is not without limitations and any Rule 404(b) evidence "should be carefully scrutinized in order to adequately safeguard against the improper introduction of character evidence against the accused." *See State v. al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 122-23 (2002) (citing

cases and text expounding upon the rationale for limitation). The United States Supreme Court in *Huddleston* recognized several factors that balance the admissibility of 404(b) evidence against safeguarding defendant's character: first, the evidence must be offered for a proper purpose; second, the evidence must be relevant; third, pursuant to Rule 403, the probative value of the evidence must not be substantially outweighed by "its potential for unfair prejudice"; and fourth, upon request, the defendant is entitled to an instruction that the jury consider the evidence only for the proper purpose that it is admitted. *Huddleston*, 485 U.S. at 691-92, 99 L. Ed. 2d at 783-84. Accordingly, we will review the trial court's decision to admit evidence surrounding the death of Elizabeth Ratliff for an abuse of discretion.[5] *State v. al-Bayyinah*, 359 N.C. 741, 747, 616 S.E.2d 500, 506 (2005).

First, the trial court found that evidence of Elizabeth's death was probative of defendant's intent, knowledge, and the absence of accident in Kathleen's death. Our appellate case law contains a cornucopia of comparable situations in which the courts have upheld the admission of evidence regarding prior deaths due to its probative value for these disputed elements. *See, e.g., State v. Moses*, 350 N.C. 741, 758-60, 517 S.E.2d 853, 864-65 (1999) (evidence of prior shooting death relevant to show identity of killer in similar death); *State v. Moore*, 335 N.C. 567, 594-96, 440 S.E.2d 797, 812-14 (1994) (prior poisoning deaths of males intimately associated with defendant relevant to show motive, opportunity, identity, and intent in trial for poisoning death); *State v. Stager*, 329 N.C. 278, 301-07, 406 S.E.2d 876, 888-93 (1991) (evidence of first husband's death by gunshot wound admissible in trial for second husband's shooting death to prove motive, intent, plan, preparation, knowledge, or absence of accident); *State v. Barfield*, 298 N.C. 306, 328, 259 S.E.2d 510, 529-30 (1979) (evidence of four other poisonings relevant to show intent, motive, and common plan or scheme in trial for poisoning), *overruled on other grounds by*, *State v. Johnson*, 317 N.C. 193, 344 S.E.2d 775 (1986); *State v. Lanier*, 165 N.C. App. 337, 346-47, 598 S.E.2d 596, 602-03 (where defendant claimed that poisoning was accidental, prior husband's drowning admissible in case against defendant for the poisoning of her husband), *disc. review denied*, 359 N.C. 195, 608

---

5. Defendant has not preserved his constitutional claims as to evidence of prior bad acts affecting the outcome of his trial, because he failed to adequately brief the portions of his assignments of error associated with that theory, *see* N.C.R. App. P. 28(b)(6). He did, however, sufficiently argue the evidentiary error alleged in the same evidence.

S.E.2d 59 (2004); *State v. Underwood*, 134 N.C. App. 533, 538, 518 S.E.2d 231, 236 (1999) (evidence of prior shooting death of person closely associated with defendant admissible in trial for shooting death of an individual also closely associated with defendant in order to show identity).

We can see no error in the determination that the circumstances of Elizabeth's death were admissible to, at the very least, show the absence of accident in Kathleen's death, as defendant claimed. "Where, as here, an accident is alleged, evidence of similar acts is more probative than in cases in which an accident is not alleged." *Stager*, 329 N.C. at 304, 406 S.E.2d at 891. "The doctrine of chances demonstrates that the more often a defendant performs a certain act, the less likely it is that the defendant acted innocently." *Id.* at 305, 406 S.E.2d at 891 (quoting Imwinkelried, *Uncharged Misconduct Evidence* § 5:05 (1984)).

> In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea.

*Id.; see also State v. Murillo*, 349 N.C. 573, 593-94, 509 S.E.2d 752, 764 (1998) (evidence of defendant accidentally shooting his first wife ruled admissible in trial for shooting death of second wife to show the absence of accident).

Second, the trial court found the evidence to be relevant. "Evidence is admissible under Rule 404(b) only if it is relevant. 'Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case.' " *Huddleston*, 485 U.S. at 689, 99 L. Ed. 2d at 782 (quoting Advisory Committee's Notes on Fed. Rule Evid. 401, 28 U.S.C. App., p. 688). "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Id.* That framework has been further refined in North Carolina such that Rule 404(b) evidence probative of a permissible purpose is admissible if it is evidence of a similar act with a certain degree of temporal proximity to the current charge. *See al-Bayyinah*, 356 N.C. at 153-55, 567 S.E.2d at 122-23.

When the features of the earlier act are dissimilar from those of the offense with which the defendant is currently charged, such evidence lacks probative value. When otherwise similar offenses are distanced by significant stretches of time, commonalities become less striking, and the probative value of the analogy attaches less to the acts than to the character of the actor.

*State v. Artis*, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989), *vacated on other grounds by*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand at*, 329 N.C. 679, 406 S.E.2d 827 (1991).

Here, the trial court concluded that:

2. Substantial evidence in the form of sufficient similar facts and circumstances exists between the two deaths so that a jury could reasonably find that the Defendant committed both acts.

3. The temporal proximity or remoteness in time between these two deaths does not diminish its effect of admissibility with respect to the purposes for which it is offered.

It based those conclusions on seventeen similarities between the circumstances of Elizabeth's death and that of Kathleen's, including in part:

a. The deceased being found at the bottom of a stairway.

b. No eyewitnesses to either alleged fall down the stairs.

c. A large amount of blood present.

d. Blood splatter present high and dried on the wall next to the stairway, including a bloodstain with small drops.

e. No evidence of any forced entry or exit, or of any property being stolen.

. . .

h. Both deceased persons were females in their late 40's who had a close personal relationship with the Defendant.

i. Both deceased persons were similar in physical characteristics so that they looked alike and reported of severe headaches in the weeks before their death.

j. Both deceased persons were planning to go on a trip in the near future and had dinner with the Defendant on the night before their death.

k. Both deceased persons were later determined to have died from blunt force trauma to the head, including the same number of scalp lacerations and the same general location of the scalp wounds.

l. Both deceased persons had what could be characterized as defensive wounds on their bodies.

. . .

n. The Defendant was the last known person to see both of these persons alive.

o. By being summoned to the scene in Germany and living at the scene in Durham, the Defendant is then present on the scene when the authorities arrive and reports that the death is the result of an accidental fall down the stairs.

p. The Defendant is in charge of the remains, effects, and household after each death, and is potentially in charge of each estate after death.

q. The Defendant received money or other items of value after each death.

Defendant contends that before the State could have used Elizabeth's death to show the absence of accident, it needed to establish a substantial and independent link between defendant and Elizabeth's death; otherwise the use of this evidence would potentially prejudice defendant based upon a prior act for which he had no involvement. But it is not necessary to the evidence's admissibility that the State specifically establish a direct evidentiary link between defendant and the previous crime or act. In fact, in *State v. Jeter*, 326 N.C. 457, 459, 389 S.E.2d 805, 806-07 (1990), the Supreme Court rejected that argument in favor of a more flexible test, such as that in *Huddleston* or *Stager*.

> [Rule 404(b)] includes no requisite that the evidence tending to prove defendant's identity as the perpetrator of another crime be direct evidence, exclusively. Neither the rule nor its application indicates that examples of other provisions—such as admissibility of evidence of other offenses to prove motive, opportunity, intent, preparation, or plan—rest solely upon direct evidence. *E.g., State v. Price*, 326 N.C. 56, 388 S.E.2d 84 (1990) (circumstantial evidence of defendant's perpetration of "virtually identi-

cal" strangulation, proximate in time, showing preparation, plan, knowledge or identity). Under the statutory scheme of Rules 403 and 404, the concern that anything other than direct evidence of a defendant's identity in a similar offense might "mislead [the jury] and raise a legally spurious presumption of guilt" is met instead by the balancing test required by Rule 403[.]

*Id.*, 389 S.E.2d at 806.

In *Stager*, our Supreme Court was presented with a scenario comparable to this one. There, the defendant was on trial for the first-degree murder of her husband. *Stager*, 329 N.C. at 284-85, 406 S.E.2d at 879. She claimed that she accidentally shot her husband when pulling a gun out across the bed from underneath his pillow one morning. *Id.* at 286, 406 S.E.2d at 880. The next day she began inquiring about death proceeds from the military, her husband being a member of the National Guard, and further inquired about life insurance proceeds. The facts, circumstances, and scientific evidence all failed to support an accidental shooting, and instead suggested the possibility of foul play.

The State introduced evidence that nearly ten years prior to Mr. Stager's death, the defendant's first husband was found dead in their bedroom killed by a single gun shot. *Id.* at 296-97, 406 S.E.2d at 886-87. The defendant stated that her husband was upstairs cleaning the gun when it must have fired and killed him. *Id.* at 297, 406 S.E.2d at 887. The defendant collected nearly $86,000.00 in life insurance proceeds and estate property after her husband's death. *Id.* at 300, 406 S.E.2d at 888.

At her trial and on appeal, the defendant argued the evidence of her first husband's death was not relevant or admissible pursuant to Rule 404(b). Our Supreme Court disagreed and found no error in the admission of the evidence due to its probative value for intent, the absence of accident, and the fact that the deaths were sufficiently similar. *Id.* at 307, 406 S.E.2d at 892-93. Relying on *Huddleston*, the Court held:

[I]f there is sufficient evidence to support a jury finding that the defendant committed the similar act [then] no preliminary finding by the trial court that the defendant actually committed such an act is required[;] . . . evidence is admissible under Rule 404(b) of the North Carolina Rules of Evidence if it is substantial evidence

tending to support a reasonable finding *by the jury* that the defendant committed a similar act or crime and its probative value is not limited *solely* to tending to establish the defendant's propensity to commit a crime such as the crime charged.

*Id.* at 303-04, 406 S.E.2d at 890. "Similar" acts or crimes, the Court held, means "there are 'some unusual facts present in both crimes or particularly similar acts which would indicate that the same person committed both.' " *Stager*, 329 N.C. at 304, 406 S.E.2d at 890-91 (quoting *State v. Green*, 321 N.C. 594, 603, 365 S.E.2d 587, 593, *cert. denied*, 488 U.S. 900, 102 L. Ed. 2d 235 (1988)).

Thus, although perhaps more persuasive, it is not necessary to the evidence's admissibility under Rule 404(b) that the State specifically connect defendant to the previous crime or act, so long as substantial evidence of the similarities of the two crimes or acts suggests that the same person committed both acts. And while defendant challenges the veracity of the trial court's findings on similarity, the numerous and unique similarities between Elizabeth's death and that of Kathleen reveal substantial circumstantial evidence that favors admissibility.

Further, we can discern little merit in defendant's argument that Elizabeth's death is too remote. It may be true that "remoteness in time tends to diminish the probative value of the evidence and enhance its tendency to prejudice," *Artis*, 325 N.C. at 300, 384 S.E.2d at 482, but "remoteness in time generally affects only the weight to be given such evidence, not its admissibility." *Stager*, 329 N.C. at 307, 406 S.E.2d at 893.

Remoteness in time between an uncharged crime and a charged crime is more significant when the evidence of the prior crime is introduced to show that both crimes arose out of a common scheme or plan. In contrast, remoteness in time is less significant when the prior conduct is used to show intent, motive, knowledge, or lack of accident[.]

*Id.* (citations omitted). The striking similarities between Kathleen's death and that of Elizabeth's overshadow the seventeen-year-difference in their deaths, particular given that the State's use of the evidence was to show absence of accident, intent, or knowledge.

Third, we see no abuse of discretion in the trial court's balancing test consistent with the dictates of Rule 403.

When prior incidents are offered for a proper purpose, the ultimate test of admissibility is whether they are sufficiently similar and not so remote as to run afoul of the balancing test between probative value and prejudicial effect set out in Rule 403. In each case, the burden is on the defendant to show that there was no proper purpose for which the evidence could be admitted. The determination of whether relevant evidence should be excluded under Rule 403 is a matter that is left in the sound discretion of the trial court, and the trial court can be reversed only upon a showing of abuse of discretion.

*Lanier*, 165 N.C. App. at 345, 598 S.E.2d at 602 (internal citations and quotations omitted); *see also Coffey*, 326 N.C. at 281, 389 S.E.2d at 56 ("Whether to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court."). The trial court here conducted an extensive *voir dire*, issued numerous findings of fact, found at least seventeen similarities between the evidence proffered and the crime charged, and concluded the "probative value of this evidence outweighs any prejudicial effect on the Defendant." We have already concluded that the similarities between the two deaths were numerous and that Elizabeth's death was not too remote.

That said, "[e]vidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree." *Coffey*, 326 N.C. at 281, 389 S.E.2d at 56; *see also Stager*, 329 N.C. at 310, 406 S.E.2d at 895 ("Certainly, the evidence was prejudicial to the defendant in the sense that any evidence probative of the State's case is always prejudicial to the defendant."). There is little doubt that the evidence of Elizabeth's death was useful to the State for challenging defendant's sole defense in this case, namely, that Kathleen's death was an accident. This evidence in and of itself is prejudicial to defendant, but not substantially so, considering that the balance under Rule 403 favors admissibility of probative evidence.

As such, we reject defendant's argument that evidence of Elizabeth's death was inadmissible because "[t]he two deaths would create a false image of convincing evidence, just as mirrors facing each other create the impression of a never-ending hall, while each examined in its own light would not withstand scrutiny." The evidence is admissible due to the fact it was offered for a proper purpose, and was sufficient to allow a jury to reasonably conclude that the act occurred and that the defendant was the actor.

## III. Evidence of Bi-Sexuality Under Rule 404(b)

**[4]** Defendant next argues the trial court erred, in ruling upon his motion *in limine,* by admitting evidence of his bi-sexuality. Defendant contends this evidence was irrelevant and unfairly prejudicial. We disagree.

Generally, evidence is admissible at trial if it is relevant and its probative value is not substantially outweighed by, among other things, the danger of unfair prejudice. *See* N.C. Gen. Stat. § 8C-1, Rules 402, 403 (2005). "Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue. In criminal cases, every circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury." *State v. Smith,* 357 N.C. 604, 613-14, 588 S.E.2d 453, 460 (2003) (internal quotations and citations omitted); *see also* N.C. Gen. Stat. § 8C-1, Rule 401 (2005) (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). The standard set by Rule 401,

> gives the judge great freedom to admit evidence because the rule makes evidence relevant if it has *any* logical tendency to prove any fact that is of consequence. Thus, even though a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal.

*State v. Wallace,* 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991) (internal citations omitted).

The trial court concluded that the evidence regarding defendant's bi-sexuality was relevant for two purposes: one, it related to a possible motive; and two, it could be used "to rebut the assertions in Defendant's opening statement regarding the idyllic relationship between the Defendant and the deceased in this case." We now consider whether the evidence of defendant's bi-sexual tendencies was relevant because it rebutted defendant's opening statements of a loving relationship. Defendant argues that none of defense counsel's opening statements "opened the door" for introduction of defendant's bi-sexuality. In his opening statement, defense counsel recounted the relationship between defendant and Kathleen as follows:

> And Michael Peterson and Katherine [sic] Atwater connected. Kathleen and Michael connected in a way that a few people who are really, really lucky in life have a chance to connect. It had nothing to do with tangible things. They felt like soul mates. . . . And so they fell in love, and in . . . 1989 they began to live together. . . . [W]hat kept them together, what caused them to build that, was a love that absolutely everyone who saw them or knew them understood and recognized, and envied[.]

Defense counsel also read from an essay Kathleen's daughter Caitlin had written in 1999:

> Michael Peterson stopped my mother's tears. . . . My father had torn her apart, crushing her shell and the illusion in which she lived, destroying her dignity and pride. But Mike was able to restore her strength and confidence, and to show her that she could find true love.

Defense counsel also showed family pictures of defendant and Kathleen throughout his opening statement.

Our courts have previously allowed evidence in to rebut a defendant's contentions made in his opening statement. *See, e.g., Murillo,* 349 N.C. at 600, 509 S.E.2d at 768 (character evidence concerning the victim's performance as a school teacher relevant to rebut the defendant's contentions in his opening statement that the victim was a violent alcoholic); *State v. Jones,* 342 N.C. 457, 463-64, 466 S.E.2d 696, 698-99 (testimony by the defendant's former girlfriend regarding a previous assault by the defendant and her fear of him was relevant to rebut the defendant's contentions in his opening statement that the reason the girlfriend delayed three years in reporting him was to get back at him and collect a reward), *cert. denied,* 518 U.S. 1010, 135 L. Ed. 2d 1058 (1996); *State v. Reaves,* 132 N.C. App. 615, 619, 513 S.E.2d 562, 565 ("This evidence was relevant to the issue of the State's inability to present shell casings from the weapon allegedly used by defendant. Defendant's counsel raised this matter in his opening argument, and, having invited the State's response, cannot now claim he was improperly prejudiced by the State's exhibition of the weapons to the jury."), *disc. review denied,* 350 N.C. 846, 539 S.E.2d 4 (1999).

As defense counsel, in his opening statement, extensively discussed defendant and Kathleen's relationship and portrayed the marriage as a happy and loving one, the trial court properly found that evidence of defendant's attempts to have sexual relations with a male escort and interest in homosexual pornography were relevant to

rebut defense counsel's opening statement. *See Wallace*, 104 N.C. App. at 502, 410 S.E.2d at 228 (trial court's ruling on relevancy given great deference on appeal). We need not determine whether the evidence of defendant's bi-sexuality was relevant to motive, as we conclude that the evidence was admissible as a rebuttal to defense counsel's opening statement.

Defendant also argues that the trial court erred in finding that the evidence of bi-sexuality was not unfairly prejudicial. As a general rule, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]" N.C. Gen. Stat. § 8C-1, Rule 403 (2005). "Evidence which is probative of the State's case necessarily will have a prejudicial effect upon the defendant; the question is one of degree." *State v. Hoffman*, 349 N.C. 167, 184, 505 S.E.2d 80, 91 (1998) (internal quotations omitted), *cert. denied*, 526 U.S. 1053, 143 L. Ed. 2d 522 (1999). The exclusion of evidence under this rule "is within the trial court's sound discretion. . . . Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

Defendant contends that the trial court abused its discretion in admitting evidence of his bi-sexuality and cites to *State v. Rinaldi*, 264 N.C. 701, 142 S.E.2d 604 (1965), in support of his argument. In *Rinaldi*, the defendant was indicted for the murder of his wife. A male witness for the State testified that the defendant solicited him to murder the defendant's wife, and for sexual relations. *Id.* at 704-05, 142 S.E.2d at 606. Our Supreme Court held that the witness's testimony regarding homosexual advances prejudiced the jury to the defendant's detriment. *Id.* at 705, 142 S.E.2d at 606-07. The Court further stated, "[t]o make such evidence competent, the State would have to show some direct connection between defendant's abnormal propensities and the charge of homicide for which he is then on trial." *Id.*, 142 S.E.2d at 607.

In the case *sub judice*, unlike in *Rinaldi*, the trial court had already specifically found that the evidence of defendant's bi-sexuality was relevant to rebut assertions made in defense counsel's opening statement. After reviewing both a written argument contained in defendant's motion *in limine* and arguments by the prosecutor and defense counsel, the trial court, in its discretion, found that the probative value of the evidence outweighed any prejudice to defendant. *See Hennis*, 323 N.C. at 285, 372 S.E.2d at 527. As the trial

court's decision was not arbitrary or manifestly unsupported by reason, the trial court did not abuse its discretion. *Id.*

Accordingly, the trial court did not err in admitting evidence of defendant's bi-sexuality.

### IV. Financial Information

**[5]** Next, defendant argues that the trial court erred in admitting irrelevant evidence of the Petersons' finances and Kathleen's job status. We disagree.

As we previously stated, relevant evidence is defined as that having "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2005). "Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue. In criminal cases, every circumstance that is calculated to throw any light upon the supposed crime is admissible. The weight of such evidence is for the jury." *Smith*, 357 N.C. at 613-14, 588 S.E.2d at 460 (internal quotations and citations omitted). The standard set by Rule 401,

> gives the judge great freedom to admit evidence because the rule makes evidence relevant if it has *any* logical tendency to prove any fact that is of consequence. Thus, even though a trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal.

*Wallace*, 104 N.C. App. at 502, 410 S.E.2d at 228 (internal citations omitted).

The State contends that evidence of the Petersons' finances and Kathleen's job status was relevant to show a possible motive or one of several motives for murder. But defendant argues that there was "no evidence establishing any link" between the Petersons' finances and Kathleen's death, and that the State relied on conjecture.

At trial the evidence presented on finances tended to show that the Petersons had some financial difficulty and defendant stood to inherit a large amount of money upon Kathleen's death. Although State's witness Kim Barker was unaware if Kathleen ever knew that she had been placed on the "optimization list," this evidence was relevant to emphasize the unstable position of employees,

including Kathleen, at Nortel. The jury could infer from this evidence that defendant murdered Kathleen, at least in part, for the proceeds from her life insurance policy, which she would have lost if she was laid off, and other financial assets, which totaled approximately $1.8 million.

Defendant cites to *State v. McDowell*, 301 N.C. 279, 271 S.E.2d 286 (1980), to support his argument that the evidence related to defendant being listed as the beneficiary for Kathleen's life insurance policy and other non-probate assets was irrelevant. In *McDowell*, the defendant wanted to cross-examine a witness with respect to whether the witness was the beneficiary of the victim's life insurance policy, to show that the witness had a motive to kill the victim. *Id.* at 292, 271 S.E.2d at 295. The Supreme Court upheld the trial court's ruling that the evidence was inadmissible because "[e]vidence that a crime was committed by another must point unerringly to the guilt of another." *Id.* However, in the instant case defendant is not attempting to use the financial information to prove another person had motive to kill Kathleen. The standard of what is relevant with regard to the State showing a defendant's motive is different than for when a defendant can show motive by a third person. *Compare Smith*, 357 N.C. at 613-14, 588 S.E.2d at 460, *with State v. Jenkins*, 292 N.C. 179, 189, 232 S.E.2d 648, 654 (1977). Therefore, *McDowell* does not support defendant's argument.

We conclude that evidence of a potential inheritance of a great deal of money combined with current financial difficulties may be evidence of a motive for murder. *See Wallace*, 104 N.C. App. at 502, 410 S.E.2d at 228. Accordingly, we hold that the trial court properly allowed evidence of defendant's and Kathleen's finances as well as Kathleen's job status as relevant for showing motive.

[6] Defendant also contends that the trial court erred in admitting the Equifax report as it is inadmissible hearsay. However, even assuming *arguendo* that the Equifax report was inadmissible hearsay and improperly admitted at trial, defendant has not asserted or demonstrated any prejudice to him by the improper admission of the report. It is well-settled that "[t]he erroneous admission of hearsay, like the erroneous admission of other evidence, is not always so prejudicial as to require a new trial." *State v. Abraham*, 338 N.C. 315, 356, 451 S.E.2d 131, 153 (1994) (internal quotations and citations omitted). "Defendant has the burden of showing error and that there was a reasonable possibility that a different result would have been reached at

trial if such error had not occurred." *State v. Locklear*, 349 N.C. 118, 149, 505 S.E.2d 277, 295 (1998), *cert. denied*, 526 U.S. 1075, 143 L. Ed. 2d 559 (1999); N.C. Gen. Stat. § 15A-1443(a) (2005); *see also State v. Sills*, 311 N.C. 370, 378, 317 S.E.2d 379, 384 (1984) ("[T]he defendant has the burden of showing that he was prejudiced by the [erroneous admission of hearsay] and that there was a reasonable possibility that a different result would have been reached at trial if the error had not been committed."). As defendant did not meet his burden of demonstrating prejudice, we find this assignment of error to be without merit.

## V. Closing Arguments

Finally, defendant argues that the trial court erred in overruling his objections to improper closing arguments by the State. As defendant raised timely objections to each of the improper arguments challenged on appeal, we review the trial court's rulings for an abuse of discretion. *State v. Jones*, 355 N.C. 117, 131, 558 S.E.2d 97, 106 (2002). This review entails determining whether the trial court's ruling "could not have been the result of a reasoned decision." *Id.* (internal quotations omitted). In order to be entitled to reversal based upon closing remarks, the defendant must establish both that the closing arguments were improper and that they prejudiced him before the jury. *Id.*

> The power and effectiveness of a closing argument is a vital part of the adversarial process that forms the basis of our justice system. A well-reasoned, well-articulated closing argument can be a critical part of winning a case. However, such argument, no matter how effective, must: (1) be devoid of counsel's personal opinion; (2) avoid name-calling and/or references to matters beyond the record; (3) be premised on logical deductions, not on appeals to passion or prejudice; and (4) be constructed from fair inferences drawn only from evidence properly admitted at trial.

*Jones*, 355 N.C. at 135, 558 S.E.2d at 108. While it is proper to impeach the credibility of an expert witness, *see State v. Norwood*, 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996), an attorney may not express a personal opinion as to a witness's credibility. *See* N.C. Gen. Stat. § 15A-1230(a) (2005) (during closing arguments, an attorney may not "express his personal belief as to the truth or falsity of the evidence").

Our appellate courts have routinely recognized that "counsel are given wide latitude in arguments to the jury and are permitted to

argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." *Jones*, 355 N.C. at 128, 558 S.E.2d at 105 (internal quotations omitted); *see also State v. Rogers*, 323 N.C. 658, 663, 374 S.E.2d 852, 856 (1989) ("Argument of counsel must be left largely to the control and discretion of the trial judge, and counsel must be allowed wide latitude in their arguments which are warranted by the evidence and are not calculated to mislead or prejudice the jury.") (internal quotations omitted). With these principles under consideration, we now address defendant's arguments.

[7] First, defendant contends the prosecutor improperly bolstered the credibility of the State's witnesses in the following remarks:

> This defendant is so arrogant that he thinks that state employees, government employees, that work for your state now, for your courthouse—work in this courthouse, this very courthouse in our county, he's so arrogant that he thinks that we would all risk our reputations, our integrity—

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

> [PROSECUTOR]: —our jobs, and even our freedom, for him? He's that important? I think not. But that's just how ridiculous some of the suggestions have been to you.

> Let me assure you that there are other cases, there are other people that are prosecuted, and he's not so special that we're willing to risk everything for him.

> [DEFENSE COUNSEL]: Objection.

> THE COURT: Overruled.

Specifically, defendant asserts that the prosecutor's statements "invited the jury to rely on the prosecutor's personal assurance that [the State] would not prosecute Defendant improperly." But we must view the statements in context. *See State v. Augustine*, 359 N.C. 709, 725-26, 616 S.E.2d 515, 528 (2005) ("a prosecutor's statements during closing argument should not be viewed in isolation but must be considered in the context in which the remarks were made and the overall factual circumstances to which they referred") (internal quotations omitted). It is evident from the record that the State was attempting to refute defendant's theory of bad faith prosecution.

Essentially, defendant asserted that the Durham Police Department and the District Attorney were framing him because he had written newspaper articles critical of the local police. The State properly argued in defense of the tactics of its investigating authorities, which tactics were challenged by defendant. *See State v. Payne*, 312 N.C. 647, 665, 325 S.E.2d 205, 217 (1985). Any restoration of the credibility of the State's witnesses was also proper, as defendant's theory attacked their credibility. *See State v. Trull*, 349 N.C. 428, 453, 509 S.E.2d 178, 194 (1998) (prosecutor may respond, in closing argument, to defense criticism of State's witnesses or investigation of the crime), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999). We hold that the trial court did not abuse its discretion in overruling defendant's objection.

[8] Next, defendant asserts that the prosecutor improperly stated her own personal opinion upon the credibility of the State's witnesses when the prosecutor argued as follows:

> And because [the State's expert witnesses] have to go face Durham County juries again, they only face juries from Murphy to Manteo, why in the world would they stake their reputation, their integrity, why would they stick their necks out to ruin their reliability when they know they've got to face people like you again? The answer to that question is they wouldn't. They wouldn't. They wouldn't come in here and give you inaccurate information. They're not going to do that.

These remarks by the prosecutor were, arguably, improper personal opinions or beliefs. *See* N.C. Gen. Stat. § 15A-1230(a); *Jones*, 355 N.C. at 135, 558 S.E.2d at 108. However, the trial court held a bench conference following defendant's objection and then issued the following curative instruction to the jury:

> Members of the jury, at several points counsel has indicated to the jury what the Court considers to be her personal opinions. Personal opinions about the credibility of witnesses or about anything else is not allowed by counsel and you ought to disregard that. The credibility of witnesses will be for the jury. Counsel can make arguments as to why she believes you should accept her position, but her personal opinions, such as "I believe," is not allowed by counsel.

"Where, immediately upon a defendant's objection to an improper remark made by the prosecutor in his closing argument, the trial

court instructs the jury to disregard the offending statement, the impropriety is cured." *State v. Woods*, 307 N.C. 213, 222, 297 S.E.2d 574, 579-80 (1982). Here, the improprieties of the prosecutor's personal opinions were cured and possible prejudice to defendant eliminated upon the trial court's curative instruction to the jury.

[9] Lastly, defendant challenges the trial court's overruling his objection to the following additional remarks concerning the credibility of the State's witnesses:

> Agent Deaver, Doctor Radisch, and Doctor Butts. You know what? They're state employees. Just like most of us that work here in the courthouse. And they work for your state. They work for your state, North Carolina.
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: Not Chicago, Illinois. Not Connecticut. They work for us. They gave you truthful and accurate information. And you know what? They didn't get paid not one penny extra to come in here. Deaver should have, my goodness what he had to go through on the witness stand, but, no, he didn't get an extra penny.
>
> They might not have written books that they're signing and autographing for everybody. They might not travel to all of the rest of the states and give seminars and lectures. They're not allowed to, actually. It's not that they're not good enough to, it's they're not allowed to. They might not have appeared on Larry King Live or Court TV. But you know what? They are tried and true. Tried and true. Because they work for us.
>
> [DEFENSE COUNSEL]: Objection.

Defendant contends that these statements by the prosecutor were designed to appeal to the jurors' bias by suggesting that the State's witnesses were more reliable than defense witnesses from other states. The State concedes in its brief that the prosecutor's characterization of the State's witnesses as unbiased because they work for the State of North Carolina was "excessive and inappropriate." Defendant points out that the trial court's curative instruction was given at a later point and not immediately following these comments. Thus, defendant argues, the curative instruction was incomplete and inef-

STATE v. PETERSON

[179 N.C. App. 437 (2006)]

fective to cure prejudice from the prosecutor's personal opinions unsupported by the evidence.

We cannot agree with defendant that the court's curative instruction failed to prevent prejudice from the State's remarks. *See State v. Barden*, 356 N.C. 316, 381-82, 572 S.E.2d 108, 149 (2002) (because the jury is presumed to follow a trial court's instructions, our Supreme Court declined to hold that a curative instruction that was incomplete was also ineffective). And even assuming *arguendo* that the trial court's instruction to the jury did not cure the State's inappropriate comments, defendant has not established prejudice requiring a new trial. Pursuant to N.C. Gen. Stat. § 15A-1443(a), defendant has the burden of showing there is a reasonable possibility that a different result would have been reached at trial had the trial court's error not occurred. *State v. Rosier*, 322 N.C. 826, 829, 370 S.E.2d 359, 361 (1988). Defendant has not met his burden of establishing that had the trial court given a more detailed curative instruction regarding the State's improper closing arguments, a different result could have been reached.

## VI. Harmless Beyond a Reasonable Doubt

Our review of the record and arguments of counsel compels our conclusion that the error arising from the constitutionally defective warrant was harmless beyond a reasonable doubt. In particular, other competent and properly admitted evidence established that the Petersons were under some degree of financial strain; that Kathleen gave defendant's e-mail address to Ms. Prislinger and that an e-mail from Ms. Prislinger was sent to this account the night of Kathleen's death; and the possibility that defendant's bi-sexual interests indicated that the Peterson marriage was less than idyllic. In light of the foregoing, we note that the evidence tainted by the impermissible warrant was merely duplicative. In addition, we held herein that the evidence surrounding Elizabeth Ratliff's death and its similarities to the circumstances of Kathleen's death was properly admitted to show the absence of accident with respect to Kathleen's death. The evidence introduced pursuant to the invalid warrant simply had no discernable effect upon the jury's verdict.

## VII. Conclusion

Defendant failed to argue in his brief the remaining assignments of error; therefore, they are deemed abandoned. N.C.R. App. P. 28(b)(6). As defendant received a trial free of prejudicial error, we affirm the judgment entered against him.

**STATE v. PETERSON**

[179 N.C. App. 437 (2006)]

No prejudicial error.

Judge LEVINSON concurs.

Judge WYNN dissents by separate opinion.

WYNN, Judge, dissenting.

This appeal arises from a protracted trial that produced seventy-eight volumes of transcribed testimony as well as a large number of exhibits. Notwithstanding his defense on the grounds of "actual innocence," Defendant Michael Iver Peterson was convicted of first-degree murder.

In his appeal, Mr. Peterson presents five issues, three of which I conclude should be addressed by North Carolina's only appellate court that sits "en banc"—the Supreme Court of North Carolina. Thus, inasmuch as our legislature has uniquely empowered a judge of the North Carolina Court of Appeals to certify questions to our Supreme Court,[6] I certify by dissent the following issues for briefing and argument before our Supreme Court:

I. Where the State's brief and argument before this Court fail to show that a constitutional error was harmless beyond a reasonable doubt, should this Court hold the State to its burden under North Carolina General Statute section 15A-1443(b) to "*demonstrate*, beyond a reasonable doubt, that the error was harmless.";

II. Did the trial court properly admit (under North Carolina Rule of Evidence 404(b)) seventeen-year-old circumstantial evidence and a newly formed expert opinion on the unrelated death of Elizabeth Ratliff in Germany; if so, was it unduly prejudicial in violation of North Carolina Rule of Evidence 403; and,

III. Were the prosecutor's improper remarks during closing arguments prejudicial to Defendant.

I.

The majority and I agree that the third search warrant in this case "woefully fails to pass constitutional muster." Upon examining the State's efforts to meet its statutory burden of showing this error was harmless beyond a reasonable doubt, I find that it fails to do so as

6. N.C. Gen. Stat. § 7A-30(2) (2005).

STATE v. PETERSON

[179 N.C. App. 437 (2006)]

demonstrated in its brief and oral argument.[7] Accordingly, I therefore conclude that Mr. Peterson is entitled to a new trial.

As the majority finds, the third search warrant was defective because the affidavit on which it was based was conclusory and thus inadequate to meet the totality of the circumstances analysis. *See Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 548 (1983); *State v. Arrington*, 311 N.C. 633, 641, 319 S.E.2d 254, 259 (1984). Moreover, the failure of the affidavit to comply with the probable cause requirements outlined in section 15A-244(3) of the North Carolina General Statutes constitutes a substantial violation of Defendant's constitutional rights. Manifestly, the evidence was seized as a result of the inadequate affidavit upon which the warrant was issued. *See State v. Hunter*, 305 N.C. 106, 113, 286 S.E.2d 535, 539 (1982).

The interest of a defendant to be free from unlawful searches and seizures is, of course, a fundamental constitutional and statutory right in North Carolina. *State v. Hyleman*, 324 N.C. 506, 510, 379 S.E.2d 830, 833 (1989).

It is a fundamental principle of our legal system that an individual's Fourth Amendment rights should not be violated, regardless of what charge that individual faces. Thus, even in the most grisly of cases, an individual's right to be free from illegal search and seizure must be strictly upheld.

*State v. McKinney*, —— N.C. App. ——, ——, 619 S.E.2d 901, 907 (2005). Accordingly, as the majority holds, the evidence seized pursuant to the 12 December 2001 warrant violated Chapter 15A, Article I, Section 20 of the North Carolina Constitution, and the Fourth Amendment to the United States Constitution.

Having determined that the trial court committed a constitutional error in this trial, the contentious issue for this panel is whether the State must be held to its burden under section 15A-1443(b) of the North Carolina General Statutes to demonstrate that the error was harmless beyond a reasonable doubt:

A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt. The *burden is upon the State* to demonstrate, beyond a reasonable doubt, that the error was harmless.

---

7. N.C. Gen. Stat. § 15A-1443(b) (2005).

N.C. Gen. Stat. § 15A-1443(b) (2005) (emphasis added); *accord State v. Mickey*, 347 N.C. 508, 520, 495 S.E.2d 669, 676, *cert. denied*, 525 U.S. 853, 142 L. Ed. 2d 106 (1998) ("[I]f the erroneous evidentiary ruling violates a right of the defendant guaranteed by the Constitution of the United States, the State has the burden of showing that the error is harmless beyond a reasonable doubt."); *State v. Silva*, 304 N.C. 122, 133, 282 S.E.2d 449, 456 (1981) (trial court's error in admitting evidence deprived the defendant of his constitutional rights; the defendant subsequently awarded a new trial, as the State failed its burden of showing the error was harmless beyond a reasonable doubt).

To determine whether the State has set forth a sufficient basis that demonstrates, beyond a reasonable doubt, that this constitutional error was harmless, this Court must analyze the State's showing in (1) its brief on appeal, and (2) its statements at oral argument.

First, in its brief on appeal in the instant case, the State did not present any argument that the trial court's error was harmless beyond a reasonable doubt; rather, the State instead set forth the following argument, urging this Court to adopt the good faith exception:

> In any event, the trial court determined that Detective Holland acted in good faith [], and the good faith exception should be applicable despite the decision in *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988). Any weakness in the warrants resulted from a weakness in writing, not a weakness in facts. *See generally Duckworth v. Eagan*, 492 U.S. 195, 208, 211-12, 106 L. Ed. 2d 166, 180, 183 (1989) (concurring opinion by Justice O'Connor). The view of the dissenting justices in *Carter* should prevail here.

Notwithstanding the State's argument, our Supreme Court clearly rejected the good faith exception in *State v. Carter*, 322 N.C. 709, 732, 370 S.E.2d 553, 561 (1988), as inapplicable to violations of the North Carolina Constitution and chapter 15A of the North Carolina General Statutes. As this Court must follow the law of *stare decisis*, we are bound by prior decisions of our Supreme Court. *Dunn v. Pate*, 334 N.C. 115, 118, 431 S.E.2d 178, 180 (1993). Therefore, we must apply the majority view in *Carter* that a good faith exception is inapplicable.

Second, at oral argument, the entirety of the statements that the State made to meet its burden of demonstrating that the constitutional error was harmless beyond a reasonable doubt is as follows:

[E]ven if the warrant was improperly issued for the computer []
it was harmless beyond a reasonable doubt because there was
similar evidence that was introduced, the evidence of Brad
Brent Wolgamott. That evidence . . . was found in the desk
drawer. Now that may have been his desk but . . . Kathleen
Peterson had her own business records in that same drawer. She
had as I recall her cell phone records or telephone bill and so
forth. It's mentioned in the brief, this is an issue that Mister
Barnwell covered, that there was similar evidence that was in
that desk drawer. Moreover, we had Brent Wolgamott's testimony
and his testimony was duplicative of the things that were seized
off of the computer from the second—from the second search
warrant. If it's sexual images that he's talking about then there
was comparable evidence that was introduced. Moreover, its not
as though this was blown up, any of these images were blown up
in big eight by tens or whatever like that and the defendant had
thoroughly prepared during jury selection, had thoroughly pre-
pared the defense or rather the jury to understand that there may
be evidence of the defendant's bisexuality there may be homo-
sexual evidence coming in. So in any event, I would say to the
court that the material seized from the computer was harmless
beyond a reasonable doubt.

This showing, like the showing in the State's brief, falls short of
demonstrating that the constitutional error was harmless beyond a
reasonable doubt.

Significantly, though the majority contends that the evidence
derived from the constitutionally infirm search warrant was "nothing
more than repetition of other properly admitted evidence," it fails to
note that, while there were several e-mails between Mr. Peterson and
Brent Wolgamott as well as nude photographs of Brent Wolgamott
found in the desk drawer, there was no other evidence presented of
pornographic images and web sites. Nor does the majority address
the fact that there was no other evidence presented regarding Mr.
Peterson's requests for financial help for expenses for his sons and
Martha Ratliff. Nor does the majority consider that there was no
other evidence of an e-mail from Mr. Peterson to Ms. Peterson, sent
less than a week before her death, regarding his desire to work on
their marriage. Indeed, the e-mail from Helen Prislinger to Ms.
Peterson the night she died would also have been inadmissible. The
State used this e-mail to show that Ms. Peterson had access to Mr.
Peterson's e-mail account and computer and could have accessed it

just prior to her death, thus perhaps discovering evidence of Mr. Peterson's bisexuality.

The record shows that there was a significant amount of evidence that could have come only from the illegally obtained computer and was not presented elsewhere by the State. The following evidence admitted at trial was seized pursuant to the unconstitutional search warrant: the testimony of Todd Markley, an expert in the field of forensic computer examination employed by CompuSleauth, Incorporated, who examined Mr. Peterson's computer; the disk drive from Mr. Peterson's computer; an e-mail from Tom Ratliff to Mr. Peterson regarding Martha's college expenses; an e-mail from Mr. Peterson to Patricia Peterson regarding their sons' expenses; an e-mail from Mr. Peterson to Ms. Peterson regarding his desire for them to work on their marriage; an e-mail from Dirk Yates, who runs an Internet service for homosexual pornography, to Mr. Peterson; e-mails between Mr. Peterson and Brent Wolgamott regarding meeting for sexual services; an e-mail from Helen Prislinger to Ms. Peterson sent to Mr. Peterson's e-mail account on 8 December 2001; numerous pictures of sexual activity from Internet browsing; Todd Markley's testimony that he recovered 2500 pictures of sexual activity from Mr. Peterson's computer; list of web site addresses, many pornographic in nature, with twenty or more occurrences; Todd Markley's investigation report, which included when files were deleted from Mr. Peterson's computer; and the Internet homepage for Nine West.

Thus, contrary to the majority's finding that "the evidence introduced pursuant to the invalid warrant was nothing more than repetition of other properly admitted evidence" and was therefore "merely duplicative," the record shows that a not insubstantial amount of evidence, some of it potentially highly inflammatory, resulted directly from the defective search warrant. The cumulative effect of this evidence was not merely "prejudicial to the defendant in the sense that any evidence probative of the State's case is always prejudicial to the defendant," *State v. Stager*, 329 N.C. 278, 310, 406 S.E.2d 876, 895 (1991), but had a substantial impact on providing a possible motive for the crime. Neither the State nor the majority addresses the effect of this additional evidence, or establishes it to be harmless.

In sum, the State failed to meet its burden demonstrating the constitutional error was harmless beyond a reasonable doubt; accordingly, the error is statutorily established as prejudicial. N.C. Gen. Stat. § 15A-1443(b). Mr. Peterson is entitled to a trial that would be free of this constitutional error and the statutorily established prejudice that

STATE v. PETERSON

[179 N.C. App. 437 (2006)]

resulted from the introduction of evidence seized under the defective warrant. N.C. Gen. Stat. § 15A-974(2) (2005).

## II.

The trial court further erred by allowing in evidence of Elizabeth Ratliff's death[8] under North Carolina Rule of Evidence 404(b), which provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may,. however, be admissible for other purposes, such as proof of motive, opportunity, intent, prepara-tion, plan, knowledge, identity, or absence of mistake, entrap-ment or accident.

N.C. Gen. Stat. § 8C-1, Rule 404(b) (2005). "[E]vidence of other offenses is admissible so long as it is relevant to any fact or issue other than the character of the accused." *Stager*, 329 N.C. at 302, 406 S.E.2d at 889 (quoting *State v. Coffey*, 326 N.C. 268, 278, 389 S.E.2d 48, 54 (1990) (emphasis omitted)).

Relevant evidence is defined as that with "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2005). "Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue." *State v. Smith*, 357 N.C. 604, 613, 588 S.E.2d 453, 460 (2003), *cert. denied*, 542 U.S. 941, 159 L. Ed. 2d 819 (2004).

Here, the trial court conducted a *voir dire* hearing to determine whether the evidence regarding the death of Elizabeth Ratliff was of a type made admissible under Rule 404(b) and was relevant for some purpose other than showing Mr. Peterson's propensity for the type of conduct at issue. *See State v. Cummings*, 326 N.C. 298, 309-10, 389 S.E.2d 66, 72 (1990). The trial court made the required findings and conclusions in this case and ruled that the proffered evidence of the circumstances surrounding the death of Elizabeth Ratliff was admis-sible under Rule 404(b) as evidence of intent, knowledge, and absence of accident.

---

8. In Mr. Peterson's assignments of error, he also challenges the constitutionality of admitting the irrelevant evidence of Elizabeth Ratliff's death; however, as he does not specifically argue these assignments of error in his brief, they are deemed aban-doned. N.C. R. App. P. 28(b)(6).

In his appeal, Mr. Peterson argues that the State did not substantially and independently link him to Elizabeth Ratliff's death and that evidence of her death was therefore inadmissible under Rule 404(b). Thus, this Court must determine, *inter alia*, whether there was substantial evidence tending to support a reasonable finding by the jury that Mr. Peterson committed the "similar act." *See Stager*, 329 N.C. at 303, 406 S.E.2d at 890.

A prior act or crime is "similar" if there are some unusual facts present indicating that the same person committed both the earlier offense and the present one. *Id.* at 304, 406 S.E.2d at 890-91. However, the similarities between the two incidents need not be "unique and bizarre." *Id.*, 406 S.E.2d at 891. "Rather, the similarities simply must tend to support a *reasonable* inference that the same person committed both the earlier and later acts." *Id.* (emphasis in original); *see also State v. Sokolowski*, 351 N.C. 137, 150, 522 S.E.2d 65, 73 (1999).

Here, as outlined by the majority, the trial court specifically found seventeen similarities between Ms. Peterson's death and Elizabeth Ratliff's death, including facts related to the circumstances of the two deaths, the characteristics of the two women, and Defendant's relationships with the two women and reported discoveries of their respective bodies. Despite these findings, it would be manifestly speculative to hold that these tenuous, circumstantial similarities now link Mr. Peterson to Elizabeth Ratliff's death. Indeed, the present case can be distinguished from two others in which our courts have considered the admission of circumstantial evidence that marked a link with defendants.

In *State v. Moore*, 335 N.C. 567, 440 S.E.2d 797 (1994), the State presented circumstantial evidence marking the similarities between the deceased's murder, a prior murder, and a prior poisoning. The similarities included: all three men were either married to or intimately involved with the defendant; each died or was severely ill from arsenic poisoning, an unusual cause of death; and, the defendant had a financial motive, opportunity, and means in each case. *Id.* at 595, 440 S.E.2d at 813. The Court held that the similarities between the crime charged and the past crimes were sufficient that a reasonable inference could be made that the same person committed all three acts. *Id.* at 596, 440 S.E.2d at 813-14.

In *State v. Lanier*, 165 N.C. App. 337, 598 S.E.2d 596, *disc. review denied*, 359 N.C. 195, 608 S.E.2d 59 (2004), the defendant's former husband had been very ill prior to his death, which was officially

listed as drowning. Following her first husband's death, the defendant collected life insurance payments and inherited his farm. *Id.* at 343, 598 S.E.2d at 601. The trial court found similarities between the former husband's death and the current victim, although he died of arsenic poisoning, as follows: both men were married to the defendant at the time of their deaths; prior to death both men became incapacitated at various times; the defendant was the only caregiver for both men; the defendant had the ability to get both men medical help prior to their deaths yet only did so at the urging of others; the defendant benefitted financially from both deaths; and, the defendant appeared to minimize the seriousness of her husbands' illnesses and attempted to treat them on her own. *Id.* at 344-45, 598 S.E.2d at 601. This Court held that the former husband's death was admissible under Rule 404(b) as it was relevant to show the current victim's death was not accidental according to the "doctrine of chances." *Id.* at 345-48, 598 S.E.2d at 602-04.

Unlike in *Moore* and *Lanier*, there were not sufficient similarities between the deaths of Elizabeth Ratliff and Ms. Peterson that a jury could make a "*reasonable* inference" that Mr. Peterson committed the prior murder—or that Ms. Ratliff's death was even a murder. *See Stager*, 329 N.C. at 304, 406 S.E.2d at 891. Here, Mr. Peterson was not intimately involved with Elizabeth Ratliff, but was simply a neighbor and friend. Also, while Mr. Peterson did receive some household goods from Elizabeth Ratliff's estate, he received the items as guardian for her daughters and in trust for them, unlike the multimillion dollar amount of money he stood to inherit individually from Ms. Peterson's estate. Moreover, at the time it occurred, Elizabeth Ratliff's death was deemed to be of natural causes by both the German and military authorities; not until her body was exhumed and re-autopsied some eighteen years later did the expert in this case opine that her death was caused by blunt trauma to the head, whereas Ms. Peterson's death was immediately determined to be a homicide.[9] Therefore, there were not sufficient substantial similarities between the two deaths.

In addition, as noted by the majority, "Rule 404(b) evidence probative of a permissible purpose is admissible if it is evidence of a similar act with a *certain degree of temporal proximity to the cur-*

---

9. The trial court's finding that the cause of death for both women was later determined to be homicide is misleading at best, as it suggests that Dr. Deborah Radisch's finding in April 2003 that Ms. Ratliff's injuries were "primarily the result of blunt trauma" had some legal significance beyond mere expert opinion.

*rent charge*" (emphasis added). This closeness in time is required because, "[w]hen otherwise similar offenses are distanced by significant stretches of time, commonalities become less striking, and the probative value of the analogy attaches less to the acts than to the character of the actor." *State v. Artis*, 325 N.C. 278, 299-300, 384 S.E.2d 470, 481 (1989), *vacated on other grounds by*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand at*, 329 N.C. 679, 406 S.E.2d 827 (1991). Thus, "remoteness in time tends to diminish the probative value of the evidence and enhance its tendency to prejudice." *Id.* at 300, 384 S.E.2d at 482.

Here, seventeen years passed between the deaths of Ms. Ratliff and Ms. Peterson; even if "remoteness in time generally affects only the weight to be given such evidence, not its admissibility," *Stager*, 329 N.C. at 307, 406 S.E.2d at 893, the passage of such a significant amount of time erodes to an even greater extent the relevance of the circumstantial similarities between the two deaths, further challenging the reasonableness of a jury's inference that Mr. Peterson was responsible for Ms. Ratliff's death.

As a jury could not make a *"reasonable* inference" that Mr. Peterson committed the prior murder, the evidence was inadmissible under Rule 404(b). *See Stager*, 329 N.C. at 304, 406 S.E.2d at 891. Therefore, I conclude that the trial court erred in admitting evidence of the death of Elizabeth Ratliff and would grant Mr. Peterson a new trial, as the evidence was highly prejudicial.

Finally, even if evidence of Elizabeth Ratliff's death is permitted under Rule 404(b), it nonetheless should have been barred from admission in this trial under Rule 403, as the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. N.C. Gen. Stat. § 8C-1, Rule 403 (2005); *State v. Everhardt*, 96 N.C. App. 1, 18, 384 S.E.2d 562, 572 (1989), *aff'd*, 326 N.C. 777, 392 S.E.2d 391 (1990). " 'Unfair prejudice,' as used in Rule 403, means 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one.' " *State v. DeLeonardo*, 315 N.C. 762, 772, 340 S.E.2d 350, 357 (1986) (internal citation and quotes omitted). That determination is within the sound discretion of the trial court, whose ruling will be reversed on appeal when it is shown that the ruling was arbitrary. *State v. Baldwin*, 330 N.C. 446, 456, 412 S.E.2d 31, 37 (1992). If, however, the probative value of the evidence is so slight and the evidence is so prejudicial that there is a substantial likelihood that the jury will consider the evidence only for

the purpose of determining the defendant's propensity to commit the crimes with which he has been charged, the evidence must be excluded under Rule 403. *State v. White*, 331 N.C. 604, 615-16, 419 S.E.2d 557, 564 (1992).

Following the *voir dire* hearing on the admission of evidence of Elizabeth Ratliff's death, the trial court concluded that "[t]he probative value of this evidence outweighs any prejudicial effect on the Defendant." However, the trial court set out no findings on the prejudice toward Mr. Peterson on this highly prejudicial and very circumstantial evidence. It is not evident from the record that the trial court properly balanced the two competing interests—probative value of the evidence versus prejudice to the defendant—but instead simply found that the evidence had probative value and summarily concluded that the probative value outweighed the prejudice to Mr. Peterson.

Thus, the trial court abused its discretion, as any probative value of the evidence of Elizabeth Ratliff's death was outweighed by the unfair prejudice to Mr. Peterson. *See White*, 331 N.C. at 616, 419 S.E.2d at 564 (the trial court abused its discretion, as any probative value of the evidence of the defendant's alleged assault upon a third victim was substantially outweighed by the danger that the evidence would predispose the minds of the jurors to believe that the defendant was guilty of the crimes charged); *State v. Hennis*, 323 N.C. 279, 286-87, 372 S.E.2d 523, 528 (1988) (the trial court abused its discretion as repetitive photographs of crime scene were unduly prejudicial). As the admission of the circumstantially speculative evidence of Elizabeth Ratliff's death was highly prejudicial, a new trial should be awarded.

### III.

Mr. Peterson also argues that the trial court erred in overruling his objections to improper closing arguments.

"A lawyer's function during closing argument is to provide the jury with a summation of the evidence, which in turn 'serves to sharpen and clarify the issues for resolution by the trier of fact,' and should be limited to relevant legal issues." *State v. Jones*, 355 N.C. 117, 127, 558 S.E.2d 97, 103 (2002) (citations and quotations omitted). In the context of a criminal jury trial, specific guidelines for closing arguments have been set out in section 15A-1230(a) as follows:

During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice. An attorney may, however, on the basis of his analysis of the evidence, argue any position or conclusion with respect to a matter in issue.

N.C. Gen. Stat. § 15A-1230(a) (2005). But our Courts have repeatedly held "that counsel are given wide latitude in arguments to the jury and are permitted to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." *Jones*, 355 N.C. at 128, 558 S.E.2d at 105.

In the present case, defense counsel interposed a timely objection to each of the prosecutor's actions that he contests; thus, we review the court's rulings for abuse of discretion. *Id.* at 131, 558 S.E.2d at 106. "In order to assess whether a trial court has abused its discretion when deciding a particular matter, this Court must determine if the ruling 'could not have been the result of a reasoned decision.' " *Id.* (citation omitted).

I agree with the majority that the trial court did not abuse its discretion with respect to overruling Mr. Peterson's objections to what he contended were the prosecutor's improper bolstering of the credibility of witnesses and offering her personal beliefs and opinions as to the credibility of the State's expert witnesses. However, Mr. Peterson also argues that the trial court erred in overruling his objection to the prosecutor's following argument:

Agent Deaver, Doctor Radisch, and Doctor Butts. You know what? They're state employees. Just like most of us that work here in the courthouse. And they work for your state. They work for your state, North Carolina.

[Defense Counsel]: Objection.

The Court: Overruled.

[Prosecutor]: Not Chicago, Illinois. Not Connecticut. They work for us. They gave you truthful and accurate information. And you know what? They didn't get paid not one penny extra to come in here. Deaver should have, my goodness what he had to go through on the witness stand, but, no, he didn't get an extra penny.

They might not have written books that they're signing and auto-graphing for everybody. They might not travel to all of the rest of the states and give seminars and lectures. They're not allowed to, actually. It's not that they're not good enough to, it's they're not allowed to. They might not have appeared on Larry King Live or Court TV. But you know what? They are tried and true. Tried and true. Because they work for us.

[DEFENSE COUNSEL]: Objection.

Mr. Peterson contends that argument appealed "to the jurors' bias by suggesting that they were represented by the State's witnesses, in contrast to witness called by the defense, who came from other states." The State concedes that the prosecutor's characterization that the witnesses were "[t]ried and true. Because they work for us[,]" "was excessive and inappropriate." Accordingly, it is given that the prosecutor's comments were improper.

Counsel may not place before the jury incompetent and preju-dicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence. *State v. Jones*, 358 N.C. 330, 350, 595 S.E.2d 124, 137 (2004) (quoting *State v. Locklear*, 294 N.C. 210, 217, 241 S.E.2d 65, 69 (1978)). Our Supreme Court has previously stated that: " 'It is especially proper for the court to intervene and exercise power to curb improper arguments of the solicitor when the State is prosecuting one of its citizens, and should not allow the jury to be unfairly prejudiced against him.' " *Jones*, 355 N.C. at 130, 558 S.E.2d at 106 (quoting *State v. Miller*, 271 N.C. 646, 659, 157 S.E.2d 335, 346 (1967)). As the evidence in this case was interpreted differently by experts for the State and for the defense, the credibil-ity of expert witnesses was crucial. Essentially, which experts the jury found more credible was determinative to the verdict. After allowing the prosecutor to improperly give her opinion on the credi-bility of the State's witnesses in violation of section 15A-1230(a), the trial court abused its discretion by failing to give specific curative instructions regarding the prosecutor's improper comments. *See Miller*, 271 N.C. at 660, 157 S.E.2d at 346 (new trial awarded where the prosecutor suggested that the defendant's witnesses were lying). As the improper comments were prejudicial to Mr. Peterson, he is entitled to a new trial.